## IN THE COURT OF APPEALS OF IOWA

No. 14-2120
Filed February 24, 2016


IN RE THE MARRIAGE OF FRANK FREDERICK WAGNER
AND TERESA REGAN WAGNER

Upon the Petition of
**FRANK FREDERICK WAGNER,**
      Petitioner-Appellee,

**And Concerning**
**TERESA REGAN WAGNER,**
      Respondent-Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Mitchell E. Turner, Judge.


Teresa Wagner appeals the economic provisions of the decree dissolving her marriage to Frank F. Wagner. **AFFIRMED.**


Teresa R. Wagner, Roanoke, Virginia, appellant pro se.

Joseph C. Pavelich of Mellon, Spies & Pavelich, Iowa City, for appellee.


Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

Teresa Wagner appeals the economic provisions of the decree dissolving her marriage to Frank F. Wagner. Teresa claims the district court should have awarded her some portion of the assets Frank received as gifts from his parents. Reviewing the record de novo, but giving weight to the district court's credibility determinations, we find the decree achieved equity between the parties. We also find the court acted within its discretion in declining Teresa's request for trial attorney fees.[1]

## I.     Background Facts and Proceedings

Frank and Teresa are both highly educated; they met at Washington University in St. Louis while pursuing graduate degrees. Frank eventually earned a master's degree in 1989 and a doctorate in 1997 in Germanic Languages and Literature. Teresa received her master's degree in Western European Studies in 1990 and then entered law school in Canada. After the parties became engaged, Teresa transferred to the University of Iowa College of Law and lived with Frank's parents during her second year of law school while Frank remained in St. Louis.

After the parties married in August 1992, Frank joined Teresa in Iowa City. Frank worked on his dissertation, taught part-time, and also did remodeling and handyman projects for his father, Frank J. Wagner.

---

[1] Teresa initially raised a third issue challenging the court's award to Frank of a portion of any future proceeds she might receive from an employment-discrimination lawsuit she filed against the University of Iowa College of Law. In her reply brief Teresa stated this issue is now moot; therefore, we do not address it.

Teresa received her law degree with distinction in 1993 and started working for a small law firm. Teresa testified the law firm grew disenchanted with her work hours and her conservative views expressed in local newspaper columns. At the same time, Frank could not secure a full-time teaching position at the university, so in 1995 Teresa accepted a full-time position with the National Right to Life Committee in Washington, D.C. Shortly after the parties moved, their first son was born. Frank continued to work on his dissertation, provided child care, and also worked as an adjunct professor. Teresa let her Iowa law license lapse. Their second son was born in 1996.

In 1997 Teresa left her full-time position to teach advanced legal research and writing in an evening class at George Mason University Law School. Teresa taught the class for three semesters, through December 1998. She also worked part time for the Family Research Council. In 1998 Teresa became a full-time "policy analyst for the council, working on domestic life issues" and earning $65,000 annually. After Frank obtained his doctorate degree in 1997, he could not find a job in his field and worked full-time as an office manager for an equipment company.

Also in 1997 Frank's parents created the Wagner Family Limited Partnership, which owned a 380-acre family farm in Guthrie County that Frank's mother had inherited and Frank's father managed. Initially, Frank's parents held all the partnership units, both general and limited. When the family gathered in Iowa City for Christmas that year, Frank's father announced the creation of the limited partnership to his five children and the two spouses of the married

children, explaining the parents would be making gifts to their children from the new entity. The parents presented the initial checks, which were made out to their five children and not the two spouses. From 1997 to 2004, Frank's parents each annually gave an equal number of limited partnership units to their five children. No units were ever given to the children's spouses.

Any distribution to Frank as a limited partner was in the sole discretion of his parents as the general partners. At some point, Frank's parents mortgaged the farm to purchase a rental property on George Street in Iowa City, which the parents then transferred into the limited partnership.

In 1999 Frank secured a full-time position with the Goethe Institute in Washington, D.C. as coordinator of its language program, earning $55,000 annually. At this point both parties were working full time and parenting their young sons. Teresa scaled back her employment with the council to part-time, though her projects still included filing amicus briefs in federal circuit court and the United States Supreme Court. The parties added two daughters to their family; the girls were born in 2000 and 2005.

During the remainder of the family's time in D.C., Teresa supplemented her part-time salary with various independent projects. She performed contract work as an editor and compiled a collection of essays into a book published in 2003. In the fall of 2003, she served as an adjunct professor at the Notre Dame graduate school of Christendom College, teaching a class in law and medical ethics. From 2004 to 2006, her supplemental employment included being a speech writer, as well as researching and writing state legislative proposals.

In 2005 Frank's parents divided the remaining limited partnership units equally among their five children. They also gave each child a small number of general partnership units. But even after these gifts, Frank's parents retained control of the property business through their own general partnership interests. Frank's parents did not give additional partnership units after 2005.[2]

Teresa and Frank moved back to Iowa City with their four children in 2006, and Frank formed Wagner Brothers, L.L.C., a one-person company specializing in home remodeling and restoration. Frank worked on his parents' rental properties, on independent projects, and on the house on Muscatine Avenue the parties had purchased with the plan to eventually turn it into their own rental property. Frank and Teresa used the $90,000 in equity from the sale of their D.C. home to pay off debts, establish a savings account, and fund renovations on the newly purchased house. The family initially lived with Frank's parents and then lived in one of the parents' properties rent free. They moved into the Muscatine Avenue house in January 2007.

Starting in August 2006, Teresa worked twenty hours a week at the law school as a writing instructor; employment that continued through the dissolution trial. Through this employment, Teresa provided the family's health and dental insurance. In addition, Teresa tutored students at the athletic center and filled an evening reference position at the law library.

In 2009 Frank and his siblings purchased an eighty-acre Guthrie County farm on contract from their maternal aunt, Elizabeth Nolan, for $160,000. This

---

[2] The district court found the total value of the limited partnership to be $1,352,000.

farm is contiguous to the farm held in the limited partnership. Frank and his four siblings each owned an undivided one-fifth interest of the Nolan farm contract. Frank's brother George managed the farm, and Frank received $2074 per year in net rental income.

In 2010 Frank's parents transferred eight of their rental properties into Wagner Management, L.L.C., including a duplex on Church Street. Frank's parents then each gave a ten percent interest in the company to each of their five children and filed the appropriate gift tax returns, which do not mention Teresa or other spouses of the married children.

In May 2011 Teresa and Frank moved into their newly purchased home, which was also on Muscatine Avenue. Frank used the four-car garage for his remodeling business and subsequently rented their previous residence on Muscatine Avenue. By 2011 Teresa had reactivated her Iowa law license. The parties separated in February 2012, and Frank moved out of the marital home. In addition to her employment at the law school, Teresa worked part-time for a transactional attorney, earning $5800 in 2012.

Because of conflicts with his siblings, in July 2012 Frank transferred his entire gifted interest in the limited liability corporation to his four siblings in exchange for the duplex on Church Street. Frank received a quit claim deed signed by all five siblings and designated a "deed of partition." Frank testified he was interested in the exchange because he would be able to store building materials for his business in the duplex's garage and alley.

In January 2013 Frank bought a house on South First Avenue to update and, hopefully, quickly resell. In February 2013 the parties jointly signed a note and mortgaged the Church Street duplex for approximately $40,000.[3] They then used the loan proceeds to fund a down payment for their purchase of a house on Post Road. The next month, Teresa and the children moved to the Post Road house (net equity $44,815), and Frank paid its $1762 monthly mortgage payments. Frank then moved back into the marital house on Muscatine Avenue (net equity $13,581) and also paid its $1744 in monthly mortgage payments.

Frank filed a petition to dissolve the marriage in October 2013. That month Teresa quit her legal position with the transactional attorney where she had earned $4400 to date in 2013, studied for a licensing exam in real estate, and obtained her real estate license. She again let her Iowa law license lapse. Teresa testified, during October 2013 through January 2014, she worked more than forty hours a week at her two part-time positions—writing instructor at the law school and realtor at Skogman Realty. Teresa earned $150 from real estate in 2013 with expenses of $2000, and she earned gross wages of $20,420 from the University of Iowa.

Teresa explained she voluntarily took a leave of absence from real estate in February 2014 to focus on her litigation against the law school. In early March 2014, Teresa owed Skogman realty $1427. Teresa testified her time in March 2014 was consumed by spring break and working on the parties' dissolution.

---

[3] The court ruled the its equity was $161,000

Consequently, Teresa had not earned any income from real estate in 2014 before trial in May 2014.

Frank sought a ruling on temporary matters at the end of February 2014, requesting Teresa pay the mortgage on her Post Road residence and asking the court to set temporary child support. The court's March 2014 ruling ordered Frank to pay $500 per month in temporary spousal support, $1651 in temporary child support, and $1200 in monthly tuition and school fees for the three children attending parochial school. The court ordered Teresa to pay the monthly mortgage payments on her residence and to continue paying premiums for health and dental insurance, ruling she would be responsible for arrearages on those premium payments. The court cautioned: "The parties are confronted with the reality that it is impossible to run and pay for two households (at the same standard of living) on the same income that previously supported one household."

Teresa's May 5, 2014 financial affidavit listed her recent purchase of a 2013 Dodge Caravan with accompanying debt of $20,300. At trial, Teresa acknowledged she did not ask Frank to use the parties' 1998 Subaru Forrester until their financial issues were resolved and instead bought the minivan, which the court valued at $500—the trade-in allowance for her 2005 Dodge Caravan.[4]

---

[4] The court ordered the Subaru transferred/gifted to the children. As to Teresa's new minivan purchase, the court found:

> More difficult is the question of what to do with the 2013 Dodge Caravan which Teresa very foolishly purchased just eleven days prior to the trial in this matter . . . . Quite frankly, Teresa's purchase of this vehicle, which she cannot afford, immediately prior to trial is simply financially irresponsible and smacks of gamesmanship. As with many of

Her affidavit also stated her US Bank credit card debt had ballooned by about $9000 to $13,214.[5]

**Trial and Decree**. Trial commenced in May 2014. Frank was age fifty and Teresa was age forty-nine. Both parties were in good health. Their children were ages eighteen, seventeen, thirteen, and eight.

Teresa testified she was negotiating a book contract with the Bradley Foundation for approximately $20,000, including a $5000 advance in the near future. She testified she would receive $5000 when the book was halfway completed and an additional $5000 to $10,000 upon publication. Also, based on connections Teresa had made after being appointed as a volunteer on the Uniform Law Commission, she had proposed a two-year, Iowa-based task force to study higher-education costs. If the project materialized, she was uncertain of the amount of pay, if any.

After our de novo review of the record, we agree with the district court's determination Teresa was significantly underemployed and using her salary as a part-time writing instructor as her income would be unfair. The court found Teresa was "an educated, bright, and articulate woman with multiple degrees, including a Juris Doctor, in addition to exceptional writing skills." After noting

---

the other debts which she has incurred during the pendency of this action, she did not inform Frank of her intent to incur this significant obligation because "we were not communicating."

[5] According to Teresa's financial filings, the $9000 in new debt accrued after November 2013, when that debt had only totaled $3758. We note from the time the parties purchased the Post Road property until the ruling on temporary matters, Frank was making the monthly payments for her residence, for his residence, and for the down payment on her residence. Also, from March 15, 2014, forward Frank paid temporary child support and temporary alimony.

Teresa could reinstate her law license with little additional effort, the court also stated: "It may be that she does not want to practice law or reenter the legal field in general. There are times, however, when one must do what one has to do and not what one wants to do." The court found Teresa had "an earning capacity of a minimum of $40,000 per year and, within a short period of time, a significantly higher earning capacity."

*Child Support.* The district court accepted the parties' stipulation to joint legal custody of the three minor children with physical care to Teresa. The court concluded Frank's total annual income from all sources was $69,950.[6] Based on these considerations, the court ordered Frank to pay $1153 per month in child support.

*Property Distribution.* The parties agreed to the valuation of many assets. Teresa asked the court to award her the Muscatine Avenue rental property ($51,860 equity), her residence on Post Road ($44,815 equity) Frank's interest in the Nolan farm contract ($84,124), her IRA annuity ($22,285), her IPERS account ($2697), a savings account held in her name only ($6450), and the newly purchased minivan ($500). Teresa agreed to repay her credit card debt, and claimed the equities required Frank's interest in the limited partnership and the Church Street duplex to be included in the marital estate.

In a detailed and well-written ruling issued on September 25, 2014, the court awarded Teresa almost all of the property and debts as she proposed, with

---

[6] The court averaged Frank's business income from 2011 to 2013 to arrive at $50,890 average annual business income. The court then added $14,401 annual net rental income (Church Street duplex ($12,329) and Nolan farm contract ($2072)) along with $4659 in annual average distributions from the limited partnership.

the exception of Frank's interest in the Nolan farm contract and Frank's gifted interests. The court summarized its distribution of $272,369 in non-gifted, marital assets: (1) Frank received marital assets of $148,729, offset by marital debt of $58,841, for a property award of $89,888; and (2) Teresa received marital assets of $123,640, offset by marital debt of $25,981, for a property award of $97,659.[7] The court found it would not be equitable to require Teresa to pay to Frank $3885 to "arrive at a purely 50-50 division" and declined to order her to pay Frank a property-equalization payment.

As to the gifted duplex on Church Street, the court found Frank's father "credibly testified that it was never the intent that the spouses of his children be a beneficiary of the gift of properties" in the limited liability corporation. The court recognized the parents had filed appropriate gift tax returns omitting any reference to Teresa or other spouses. After discussing the July 2012 deed of partition, issued before the filing of the dissolution petition, the court concluded: Neither the original interest in the limited liability corporation or the title to the duplex "has ever reflected that Teresa had any ownership interest in the property or that [she] was ever intended to be a beneficiary of either the gift, or the property, nor has this asset been comingled since its transfer to Frank." The court also noted Teresa's lack of contribution to the maintenance or management of the duplex and set aside that asset to Frank as gifted property.

_____

[7] The district court specified its calculation of $84,822 in divisible marital debt excluded mortgages and vehicle encumbrances, which the court ordered to follow the asset. The court specifically found Teresa was not credible in testifying she thought Frank was paying the premiums for health and dental insurance. Referencing the temporary order, the court ordered Teresa to pay the $1555 arrearage in premiums.

Regarding Frank's limited and general partnership units in the limited partnership created by his parents, the court found "Frank's father, who owns 40% of the general partnership units" also provided all of the management services. The court noted Frank visited the farm only sporadically and Teresa had only seen the farm on one or two occasions. Further, the evidence showed neither party "provided services or labor" to the "property since it has been in" the limited partnership. The court additionally found Frank's father "credibly and conclusively testified" the gift "was made to Frank alone and not to Teresa or to any of his other children's spouses." The court discounted Teresa's recollection that both her name and Frank's name were on the 1997 envelope containing the partnership papers, finding: "No credible testimony established this fact, nor has any of the annual distributions from the limited partnership ever listed Teresa's name on the check." The court concluded Frank's interest in the limited partnership was "a gift to Frank alone."

The court then discussed whether the equities to be considered under Iowa Code section 598.21(6) (2013), nevertheless required it to award some portion of the gifted properties to Teresa. As to the Church Street duplex, the court noted the recent origin of this gift, the limited liability corporation, was created in 2010, less than two years before the parties separated and three years before Frank's dissolution filing. The court found Teresa did not make any contributions toward the property and also found, while "Teresa professed to having a close relationship with Frank's parents, she categorically did not establish the existence of any independent close relationship between herself

and Frank's parents" over and above her role as Frank's wife. The court also stated Teresa had no special needs.

The court then discussed Frank's interest in the second gifted asset, the limited liability partnership, applying the above conclusions and also finding "whatever annual income distributions were made by" Frank's parents, averaging $4659 per year from 2011 through 2013, "were, and continue to be, completely discretionary on their part and never significantly impacted the lifestyle of the parties." The district court concluded "the entirety of Frank's interests in these two gifts should be set aside to Frank and a refusal to award Teresa any interest in these gifts" is not inequitable.

*Spousal Support.* Teresa requested spousal support. After noting the facts of Teresa's "valuable" law degree, her lack of physical or psychological impairments affecting her ability to obtain significant full-time employment, her significant and equitable property settlement, and her underemployment, the court found Teresa "may require a short period of time within which to fully reenter the workforce and take advantage of her significant educational assets and experience." Accordingly, the court ordered Frank to pay rehabilitative alimony to Teresa of $1000 per month for two years, $750 per month for the following two years, and as of October 15, 2018, $500 per month for one year ($48,000 total). In the event Frank died before this obligation was satisfied, the court ordered "all remaining unpaid alimony payments shall constitute a claim against Frank's estate."[8]

---

[8] Teresa does not request an adjustment to the spousal-support award on appeal.

**Teresa's Post-Trial Motion—Rule 1.904**. In her motion, Teresa did not take issue with the division of the marital assets acquired during the term of the marriage. Rather, her motion claimed the court should have analyzed the criteria in Iowa Code section 598.21(5)(a)-(m) in deciding whether equity required the court to divide the gifts received by Frank from his parents. Ruling "Teresa is mistaken," the district court explained Iowa Code section 598.21(5) specifically excludes gifted property and section 598.21(6) guided its analysis of whether to distribute gifted property. The court concluded it had identified and applied the law appropriately.[9]

The court also addressed Teresa's implication Frank's mother may have had some intent to include Teresa as a recipient of the gifts, ruling Teresa's implication "is not supported by a single shred of credible evidence and would completely ignore the annual 'Joint Memorandum of Gift'" signed by both parents, "as well as the fact Teresa's name was never placed on a check for any distribution" from the limited partnership. The court likewise found no credible support for Teresa's claim she regularly visited the gifted properties, with and without Frank. Finding Teresa's motion misstated the court's findings, the court reiterated its conclusion the income from the limited partnership "never *significantly* impacted the lifestyle of the parties."

The court noted Teresa had been granted a substantial alimony award in light of the parties' incomes, the relatively meager marital assets, and Frank's post-decree debt obligations. Considering the alimony provision and the property

---

[9] We reject Teresa's identical argument on appeal, and like the district court, we perform our analysis of gifted property guided by Iowa Code section 598.21(6).

division together, the court denied Teresa's request for modification of its findings of fact and distribution of property.[10]

**Post-Trial Motion—New Trial.** Teresa requested a new trial on the basis of newly discovered evidence, the inferred testimony of her mother-in-law. The district court rejected this challenge. Teresa timely appealed.

## II. Standard of Review

We review the district court's decision de novo. *In re Marriage of McKenzie*, 709 N.W.2d 528, 531 (Iowa 2006). We examine the entire record and decide anew the legal and factual issues properly presented. *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). But "we recognize that the district court was able to listen to and observe the parties and witnesses." *In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009). Consequently, we give weight to the district court's findings of fact, especially when considering the credibility of witnesses, but we are not bound by them. *In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009). We will disturb the district court's ruling only when there has been a failure to do equity. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

---

[10] In Teresa's post-trial motion and on appeal she claimed the district court incorrectly found she was not actively involved in job searches. After a detailed discussion of the evidence, including Teresa making $44,092 in 2011, $25,889 in 2012, and $24,694 in 2013, the district court declined to alter its findings regarding the diligence with which Teresa attempted to obtain full-time employment. We believe the record supports the district court's findings.

### III.    Property Gifted to Frank by his Parents

Teresa argues the district court erred by not including the gifts from Frank's parents in the property distribution, specifically, Frank's interest in the limited partnership and his ownership of the Church Street duplex, derived from the limited liability corporation. She contends Frank's parents intended to include her as a recipient in these gifts and also asserts setting aside the properties is inequitable. Frank responds the gifts were made solely to him and the court correctly declined to award Teresa any interest in these gifts under equitable principles.

Marriage partners are entitled to an "equitable share of the property accumulated through their joint efforts." *In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996). Iowa courts "divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). Our statutes specifically exclude two types of property from the marital estate—inherited property and gifts received by one party. *See* Iowa Code § 598.21(5). Thus, dissolution courts generally award inherited and gifted property to the recipient spouse, "independent from the equitable distribution process." *Schriner*, 695 N.W.2d at 496.

We first determine whether these gifted properties are marital property, using the controlling factors of "the intent of the donor and the circumstances surrounding" the gift. *Liebich*, 547 N.W.2d at 851. "Placing [gifted] property into joint ownership does not, in and of itself, destroy the separate character of the

property." *Id.* In resolving this issue, the district court found Frank's father "credibly and conclusively testified" the gifts were made to Frank alone.

After our de novo review of the legal documents, none of which contain Teresa's name, and the testimony of Frank's father, giving deference to the district court's credibility assessments, we agree Frank was intended to be the sole recipient of the gifted assets. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (recognizing appellate courts "are denied the impression created by the demeanor of each and every witness as the testimony is presented"). Like the district court, we are not persuaded by Teresa's speculation Frank's mother, who did not actively manage any of the gifted properties, would have testified she and her husband intended to include Teresa as a gift recipient. We similarly reject Teresa's claim her attendance at one meeting at the Church Street duplex and the parties' act of mortgaging that property to provide the down payment for Teresa's residence on Post Road was sufficient commingling to require the property to be divided as a marital asset. *See Liebich*, 547 N.W.2d at 851 (recognizing "the act of placing gifts or inheritances received by one spouse into joint ownership and/or commingling the same with other marital assets is not controlling in deciding whether the property should be divided as a marital asset").

But our analysis does not end there. The exclusion of property given solely to Frank under section 598.21(5) "is not absolute. Iowa has a hybrid system that permits the court to divide inherited and gifted property if equity demands in light of the circumstances of a spouse or the children." *Schriner*, 695

N.W.2d at 496; *see* Iowa Code § 598.21(6).  Therefore, we consider the following factors in deciding whether it would be inequitable to exclude Frank's gifted assets from division:

> (1) contributions of the parties toward the property, its care, preservation, or improvement[ ];
> (2) the existence of any independent close relationship between the donor[s] . . . and [Teresa];
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to [Teresa] or [the parties children] to have the property set aside for the exclusive enjoyment of [Frank].

*See McDermott*, 827 N.W.2d at 679 (quoting *In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000)).

Further, the length of the marriage is an important factor "where the parties have enjoyed, over a lengthy period of time, a substantial rise in their standard of living as the result of gifts." *Goodwin*, 606 N.W.2d at 320.  Where the gift has substantially raised the standard of living, then the court's property division "should enable the parties to continue that lifestyle, even if that goal requires the division of gifted property." *Id.*

As to the first and fourth factors, the record shows Teresa did not contribute to the care, preservation, or improvement of the gifted properties and she does not have any special needs.[11]  As to the second factor, the record

---

[11] Although not asserting she has any special needs, Teresa claims the district court overvalued her law degree.  In support, she presents excerpts from publications that were not submitted to the district court.  We do not consider the information Teresa presented for the first time on appeal; it is outside our record.  *See* Iowa R. App. P. 6.801.  On this issue, we adopt the district court's ruling on Teresa's post-trial motion.

supports Teresa's position she warmly embraced the elder Wagners, especially her mother-in-law Barbara, during her marriage to Frank. But we find her connection to them was dependent on her role as Frank's wife and not the kind of independent close relationship with a donor that would call for division of the gifted property.

Regarding the third factor, while Teresa's part-time employment has contributed to the family's economic welfare, we do not conclude she made extensive contributions that preserved the gifted properties. *See In re Marriage of Thomas*, 319 N.W.2d 209, 212 (Iowa 1982) (upholding district court's exclusion of husband's gifted interest in the family farm despite wife contributing to improvements to farm home and her extensive contributions to family income mitigating toward division of the gifted interest where wife, on the other hand, was well qualified to fend and care for herself and has no special needs).

Before we discuss the fifth factor, we consider the effect of the parties' twenty-one-year marriage. As the district court recognized, the elder Wagners launched the limited liability corporation, the genesis of Frank's ownership of the Church Street duplex, in 2010, less than two years before the parties separated and only three years before Frank filed for divorce. We additionally observe the duplex was not transferred to Frank in exchange for his interest in the limited liability corporation until five months *after* the parties separated. Thus, Teresa has not enjoyed a substantial rise in her standard of living *over a lengthy period of time* due to this gift from Frank's parents. *See Goodwin*, 606 N.W.2d at 320; *see also In re Marriage of Van Brocklin*, 468 N.W.2d 40, 45 (Iowa Ct. App. 1991)

(recognizing length of time property was held after being gifted is a factor indirectly bearing on the court's analysis of the factors in section 598.21(6)).

We reach the same overall conclusion regarding the interplay of the limited partnership gifts, though they started in 1997, and the length of Teresa's marriage to Frank. Frank received *gross* annual income of $4659 per year from 2011 through 2013 from the Wagner Family Limited Partnership. Frank and Teresa's tax returns for those years show total income from all sources of $115,568 (2011), $83,346 (2012), and $87,729 (2013). Further, the distribution of income from the limited partnership occurred solely at the discretion of the general partners, Frank's parents, and could be discontinued at any time in the parents' sole discretion. As the district court aptly found, the income distributions from the limited partnership "never significantly impacted the lifestyle of the parties."

Fifth and finally, we consider whether any other matter would render it plainly unfair to Teresa to have the gifted assets set aside for Frank's exclusive enjoyment.

Teresa claims equity requires the gifted properties to be divided, asserting she relied on the value of those gifts "during her primary earning years as her only savings for retirement." Teresa's own testimony is the only evidence substantiating her claimed reliance on Frank's gifted properties as her retirement fund. The district court questioned the veracity of Teresa's testimony, and we defer to such credibility findings even in our de novo review.

Teresa overstates her case when she claims the gifted properties were "her only savings for retirement" and Frank has now burdened her "with no retirement savings." Teresa testified she and Frank planned to *acquire* income properties to fund their retirement, an assertion borne out by the parties' purchase and subsequent rental of a house on Muscatine Avenue—a rental property awarded to Teresa and jointly valued at $187,500 with $51,860 in net equity. While declining to divide the gifted assets, the court did strive to achieve equity. In contrast to the valuable rental property assigned to Teresa, the court gave Frank the house he was hoping to sell that had a negative net equity of $4200. Additionally, Teresa was awarded her *other* retirement assets—an IRA annuity and a small IPERS plan.

We conclude equity does not require that Teresa receive a benefit from either Frank's interest in the gifted property or his "potential inheritance" of other gifted assets for the following reasons: (1) Teresa did not place a significant reliance on Frank's gifted assets during the marriage; (2) Teresa owned and was awarded other retirement assets; (3) Frank was required to pay the majority of the marital debt (including the down payment on Teresa's residence); (4) Frank will pay Teresa a significant amount of rehabilitative spousal support, and—given her advanced education and proven intellect—she can expect to increase her earning capacity and build upon her retirement savings before reaching age sixty-five; and (5) even though Teresa received more assets in the property distribution, including two properties each valued in excess of $187,000, she was not required to make a property-equalization payment to Frank.

Because the district court treated the parties equitably in the overall property distribution and spousal support provisions of the decree, we affirm.[12]

## IV.     Attorney Fees and Court Costs

Teresa argues the district court should have ordered Frank to pay her trial attorney fees.  Such an award is discretionary, and the court's ruling will not be disturbed absent an abuse of discretion.  *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa Ct. App. 1983).  Although Frank's earned income was higher than Teresa's, the record discloses Teresa had sufficient cash at the time of trial to pay her own fees.  The controlling consideration in the attorney-fee determination is often the parties' respective abilities to pay.  *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).  Under the unique circumstances of this case, we conclude the district court did not abuse its discretion in holding both parties responsible for their own attorney fees.

Frank requests appellate attorney fees. Such an award is a matter of discretion. *In re Marriage of Benson*, 545 N.W.2d 252, 258 (Iowa 1996).  In determining whether to award appellate attorney fees, we consider the parties' financial positions and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.*  Although Frank successfully defended the district court's ruling on appeal, after considering the relative

---

[12] We have long recognized that in our evaluation of the individual sufficiency of the district court's property division and award of spousal support, we consider those rulings together because they "are neither made nor subject to evaluation in isolation from one another." *In re Marriage of Griffin*, 356 N.W.2d 606, 608 (Iowa Ct. App. 1984).

financial positions of the parties in this case, we decline to award appellate attorney fees.

Costs of this appeal are taxed to Teresa.

**AFFIRMED.**