# IN THE COURT OF APPEALS OF IOWA

No. 16-1211
Filed October 11, 2017

**IN RE THE MARRIAGE OF ROBERT H. GOODRICH
AND TERESA O. GOODRICH**

**Upon the Petition of
ROBERT H. GOODRICH,**
        Petitioner-Appellant/Cross-Appellee,

**And Concerning
TERESA O. GOODRICH,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Richard B. Clogg,

Judge.


        Robert Goodrich appeals, and Teresa O'Hara cross-appeals, the

economic provisions of the decree dissolving their marriage.  **AFFIRMED AS

MODIFIED.**


        Ryan D. Babich of Babich Goldman, P.C., Des Moines, for

appellant/cross-appellee.

        Ryan A. Genest of Culp, Doran & Genest, P.L.C., Des Moines, for

appellee/cross-appellant.


        Heard by Doyle, P.J., and Tabor and McDonald, JJ.

**TABOR, Judge.**

Robert Goodrich appeals the economic provisions of the decree dissolving his thirty-one-year marriage to Teresa O'Hara.[1] She cross-appeals. Robert challenges: (1) a $10,000 cash property settlement awarded to Teresa, (2) the amount of traditional alimony and a requirement he maintain a life insurance policy for Teresa's benefit, and (3) Teresa's award of trial attorney fees. Teresa contends the alimony amount is too low and the district court should not have provided for an automatic reduction in support once Robert reaches full retirement age and receives social security benefits.

Because the record does not support the equalization payment awarded to Teresa, we modify the decree to eliminate that obligation placed on Robert. On the question of alimony, we find the amount ordered was too high when considering the factors under Iowa Code section 598.21A (2016), and we modify the decree accordingly. We affirm an automatic reduction in support but modify the amount. We also modify the life-insurance requirement to provide for the termination of this obligation in 2025. We opt not to disturb the award of trial attorney fees, and we decline the parties' requests for appellate attorney fees.

## I.      Background and Prior Proceedings

Robert and Teresa married in 1985. Teresa received a bachelor's degree from Drake University that same year; Robert attended some college but never earned a degree. Over the years, Robert was the primary wage earner for the family. Teresa contributed some income as well, generally working part-time, but

---

[1] The district court granted Teresa's request to resume using her maiden name.

she left the work force for several years to take care of the home and their three children, who are all now young adults. From 2011 to 2014 she worked to establish her own business producing organic soaps.

The parties separated in 2014, and Teresa moved out of the family home. Just before the separation, between January and March 2014, Robert drew $16,000 in advances on their home equity line of credit. Teresa testified she did not know about the advances, but she also acknowledged that Robert handled all of the family finances. Robert claimed he did not know Teresa was planning to move out of the home until February. He testified his earnings had temporarily decreased due to a hernia surgery and he used the funds to pay off the balance on their joint credit card. Some sums were advanced because Robert knew Teresa's move would adversely impact the household cash flow.

In February 2015, Robert and Teresa sold their home. Robert used $8100 of the proceeds to rent back the home from the buyers for four months past the date of the sale. From the remainder, the parties each received $20,000 for their own use and then deposited $42,000 in a joint checking account, which they agreed would be used to pay off their joint debt. At trial, Teresa argued Robert used the funds in the joint checking account to pay off his own personal debts and received a disproportionate share of the home-sale proceeds because of the rent-back arrangement. Teresa explained that when Robert removed himself from their joint credit card account, she was left to pay a balance of more than $12,000 on that card, much of which she classified as Robert's personal debt and joint debt.

Robert filed for divorce in June 2015. Throughout the course of the proceedings, Teresa relied in large part upon her inherited funds to pay her expenses. With some exceptions, Robert paid Teresa $2000 a month, and three months before trial, on December 15, 2015, the district court ordered Robert to pay Teresa temporary support in that amount. Even with Robert's support, Teresa's money market account, which contained only inherited funds, diminished from $60,475 to $11,509.[2]

At the time of trial in late March 2016, Robert was living in Phoenix, Arizona, and Teresa was living in Eugene, Oregon. Robert was self-employed, working as a regulatory and quality assurance consultant for small drug manufacturers and re-packagers. Teresa was unemployed but acknowledged an earning capacity of $22,880 in gross annual income. The primary issue to be resolved at trial was the amount of spousal support Teresa should receive. Robert proposed $1000 a month; Teresa requested $3600.

The district court entered the dissolution decree in early May 2016. The court awarded Teresa her Scottrade IRA ($48,496) and American Trust IRA ($28,985),[3] as well as $34,709 from Robert's Scottrade IRA ($128,164). The court also awarded Teresa a $10,000 cash property settlement.[4] The court ordered Robert to pay Teresa $2600 a month for traditional alimony, as well as $8637 toward Teresa's attorney fees.

---

[2] Teresa used $12,500 from the account to purchase a vehicle.
[3] The American Trust account consisted of funds Teresa had inherited from her father.
[4] Teresa had requested $43,570.98.

Both parties filed motions to enlarge and amend the court's findings. In response, the court reduced Robert's alimony requirement to $2000, to continue until he reaches full retirement age and receives social security benefits. After that time, Robert was to pay $1000 a month until either Robert or Teresa's death or until Teresa remarried. The court also ordered Robert to pay for and maintain $100,000 of life insurance with Teresa as the primary beneficiary for as long as the alimony obligation continued.

Robert appeals, and Teresa cross-appeals.

## II.     Scope and Standard of Review

Because dissolution proceedings are equitable in nature, our review is de novo. *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the fact-findings of the district court, particularly when considering the credibility of witnesses, but we are not bound by them. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We ordinarily will not disturb the district court's ruling unless it fails to do equity. *See In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998). Our review of the district court's award of attorney fees is for an abuse of discretion. *See id.*

## III.     Cash Property Settlement

The district court ordered Robert to pay Teresa a cash property settlement of $10,000 in monthly payments of $178.18, including interest at the rate of 2.66% per year, "to equalize the division of property, excluding retirement accounts." The court indicated the payments were "intended to be an additional source of maintenance and support to [Teresa] as contemplated by [s]ection

523(a)(5) of Title 11, United States Code."[5] The court did not explain how it arrived at the amount of the equalization payment but did find:

> The parties sold their home during the pendency of this action. When the home was sold, the parties agreed to pay off all joint debt. Teresa received a smaller settlement from the sale of the home than she initially anticipated. Robert also paid off his own personal expenses and marital expenses, which reduced what Teresa received from the sale of the parties' home.

The court continued: "At the present time, Teresa has been required to [expend] a substantial portion of monies she inherited from her father's estate to support herself. Teresa should be reimbursed an amount of money from Robert to ensure there is a fair and equitable division of the marital property."

Robert argues the $10,000 equalization payment is inequitable because the $34,709 taken from his Scottrade IRA account "equalized each party's respective net worth." He asserts he does not have the ability to pay $10,000 to Teresa and it is inequitable to order him to make payments toward the balance in increments, with interest, particularly because he will not receive the tax benefits of alimony payments. In support of his position, Robert directs us to the following chart of the parties' assets:[6]

---

[5] That subsection prevents an individual from discharging debt "for a domestic support obligation." 11 U.S.C. § 523(a)(5).

[6] He lists the parties' liabilities as zero.

| DESCRIPTION | OWNER | VALUE | DISTRIBUTION | |
|---|---|---|---|---|
| | | | Robert | Teresa |
| 2009 Chevrolet Aveo | H | $2305 | $2305 | |
| 2012 Nissan Rogue | W | $19,000 | | $19,000 |
| Robert's US Bank Checking | H | $1333 | $1333 | |
| Robert's US Bank Savings | H | $8294 | $8294 | |
| Robert's US Bank Business Checking | H | $4120 | $4120 | |
| Teresa's US Bank Money Market | W | $11,509 | | $11,509 |
| Robert's Scottrade IRA | H | $128,164 | $93,455 | $34,709 |
| Teresa's American Trust IRA | W | $28,985 | | $28,985 |
| Teresa's Scottrade IRA | W | $48,496 | | $48,496 |
| TOTAL | | $252,206 | $109,507 | $142,699 |
| LESS NON-MARITAL ASSETS | | | ($8294) | ($41,485) |
| TOTAL | | | $101,213 | $101,214 |

Teresa does not challenge Robert's valuations. Rather, in her appellate brief she contends the district court implicitly imputed additional assets to Robert because he "dissipated the marital estate by drawing large amounts of money on home equity lines of credit without Teresa's knowledge or consent." She also argued Robert "diverted funds from the house proceeds to pay for personal expenses rather than agreed upon [marital] debt." At oral argument, Teresa's counsel took a more conciliatory approach, stating Teresa was not advancing a "dissipation argument." Instead, her counsel urged that Robert didn't follow the parties' agreement concerning division of the credit card debt and emphasized that Robert had not explained his large draws on the home equity line of credit.

In dissolution proceedings, the parties are entitled to an "equitable share of the property accumulated through their joint efforts." *In re Marriage of Liebich*, 547 N.W.2d 844, 849 (Iowa Ct. App. 1996). This means dissolution courts "divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property," such as inherited

property. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005); *see also* Iowa Code § 598.21(5). Equitable distribution does not necessarily require an equal division of property between the parties. *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). Instead, we look to the particular facts of each case to determine what is fair and equitable, using the criteria in Iowa Code section 598.21(5). *Id.*

The decree does not show a disparity in the property division to justify the $10,000 equalization payment. The district court's narrative hints at several circumstances that may have influenced its decision, but we find none of those suggestions sufficient to support a calculation requiring Robert to pay Teresa an additional $10,000. The court mentions Teresa's smaller than expected settlement from the home sale and Robert's repayment of personal and family expenses during the separation but does not explain how those financial strains tallied up to the amount of the equalization payment ordered. The court does not characterize Robert's actions as dissipation or waste of the parties' assets.

The parties' legitimate living expenses incurred during their separation and the balance on a joint credit card amounted to marital debt. If those debts had been outstanding at the time of the dissolution, it would have been proper for the district court to divide them between the parties. *See Locke v. Locke,* 246 N.W.2d 246, 252 (Iowa 1976). But because those debts had been satisfied— and Teresa has not proven a claim of dissipation—it would be inequitable to order Robert to make an equalization payment in any amount. We modify the decree to eliminate the equalization payment.

## IV.   Alimony

The parties agree the district court properly awarded Teresa traditional alimony, which is "payable for life or so long as a spouse is incapable of self-support." *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005) (citation omitted).   But they dispute the amount of the award, the automatic reduction once Robert reaches retirement age and receives social security benefits, and the mandate Robert maintain a life insurance policy with Teresa as the sole beneficiary.   We address each disputed aspect in turn.

**Monthly Amount.**   Without explicitly determining Robert's earning capacity, the district court ordered Robert to pay $2000 a month in alimony until he reaches retirement age and receives social security benefits.   Robert argues this award is too high.   By averaging his income from several years of self-employment, he estimates his earning capacity at $58,599.   Assuming Teresa's earning capacity was, at a minimum, $22,800, Robert argues we should set his alimony obligation at $1000 a month.   In urging this amount, Robert cites *In re Marriage of Gust*, 858 N.W.2d 402, 416 n.2 (Iowa 2015) (finding similarity between section 598.21A(1) and guidelines of the American Academy of Matrimonial Lawyers (AAML), which suggest basing alimony on 30% of payor's gross income minus 20% of payee's gross income).   Teresa questions Robert's income calculation and contends we should increase his obligation to $2600 a month.

Given the variables here, imputing Robert's earning capacity is not an exact science.   Over the course of the marriage, Robert's income varied.   The family moved to Des Moines in 2000, and in 2003, Robert began working for a

pharmaceutical company. According to his social security record, from 2003 to 2007, Robert earned between $105,084 and $125,076 per year. Robert lost his job in 2008 and started his own consulting business, in which he had steady revenues from a valuable client. But as business from that Des Moines client decreased, Robert decided to move to Arizona in 2015. Robert testified he "need[ed] to seek a better economic area than Des Moines offered" and believed Phoenix would provide more opportunities. His 2015 earnings were $45,000, but he was optimistic they would increase because the move allowed him to raise his billing rate by 30% to sixty dollars an hour. Robert asks us to rely upon his average "salary equivalent" of $58,599, which he calculates as follows:

| Year | Gross Receipts | Expenses | Net Profit | Expense % | ½ of Self-Employment Tax | Salary Equivalent |
|------|----------------|----------|------------|-----------|--------------------------|-------------------|
| 2009 | $74,695 | $19,450 | $55,245 | 26.0% | $3909 | $51,336 |
| 2010 | $83,672 | $19,104 | $64,568 | 22.8% | $4166 | $60,402 |
| 2011 | $85,730 | $21,548 | $64,182 | 25.1% | $4534 | $59,648 |
| 2012 | $86,190 | $20,964 | $65,226 | 24.3% | $4607 | $60,619 |
| 2013 | $89,515 | $17,521 | $71,994 | 19.6% | $5086 | $66,908 |
| 2014 | $84,725 | $12,971 | $71,754 | 15.3% | $5070 | $66,684 |
| 2015 | $66,090 | $18,100 | $47,990 | 27.4% | $3391 | $44,599 |
| **Average** | **$81,517** | **$18,523** | **$62,994** | **22.9%** | **$4395** | **$58,599** |

Teresa does not specify how we should calculate Robert's income. At trial she argued his projected gross income was $124,800—were he to work a full-time schedule at his hourly rate of sixty dollars. At oral arguments, her counsel asserted we should find Robert's earning capacity falls between $90,000 and $100,000 based on the gross receipts of his consulting business. Teresa cites Robert's optimism about his move to Phoenix and increased billing rate and

contends "Robert can and will earn substantially greater income than $58,599." She contends $2600 per month in alimony would be "entirely equitable."[7]

The record demonstrates Robert's income to be slightly higher than he urges on appeal. According to Robert's social security statement, Robert earned an average income of $59,622.50 between 2009 and 2014.[8] According to Schedule C of Robert's federal tax return, his net profits between 2011 and 2015 averaged $64,229.20.[9]

With that income in mind, we proceed to a consideration of the amount of alimony. While the AAML guidelines cited by Robert may "provide a useful reality check in some cases," they may "serve neither as the starting point for a trial court nor as the decisive factor for a reviewing court on appeal." *See Mauer*, 874 N.W.2d at 108 (citation omitted). Instead, we consider the factors in Iowa Code section 598.21A. Relevant considerations include: (1) the length of the marriage, (2) the age and health of the parties, (3) the distribution of property, (4) the educational level of the parties, (5) the earning capacity of the spouse seeking alimony, and (6) the feasibility of the spouse seeking alimony becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage. *See In re Marriage of Hansen*, 733 N.W.2d 683, 704 (Iowa 2007) (citing Iowa Code § 598.21A(1)(a)–(f)). Because the trial court is "in the

---

[7] Teresa also questions the amount of Robert's expenses, claiming "Robert ha[s] a history of overstating deductions." But as Robert notes in his reply, Teresa provides no support for this claim and she signed joint tax returns showing Robert's business expenses until 2015.

[8] The amount for 2015 was not included in the statement.

[9] Robert provided tax returns for 2011–2015. His average total income was $68,363.20. His average adjusted gross income was $54,289.20.

best position to balance the parties' needs," we only intervene where there is a failure to do equity. *Gust*, 858 N.W.2d at 416.

Robert and Teresa were married for more than three decades. At the time of the dissolution trial, Teresa, age fifty-six, was in good health, and Robert, age sixty, was in relatively good health, although recently he had been diagnosed with an obstructive bladder.

Teresa had a college degree, but she had been out of the workforce for several years taking care of her family and, when she did work outside the home, generally maintained part-time hours. The parties agreed Teresa could earn at least $22,880 a year—the gross annual income of a full-time job at Oregon's minimum wage. But that amount would not cover her estimated monthly expenses of $3356.33. Robert did not have a college degree and had recently moved to improve his business prospects. *See id.* He had increased his hourly rate but testified he was still working on building his client base.

Teresa had approximately $40,000 in non-marital inherited funds available to her, with an additional $35,000 pending; Robert had just more than $8000 in inherited funds. *See In re Marriage of Hardy*, 539 N.W.2d 729, 732 (Iowa Ct. App. 1995) (noting "we consider . . . inherited and gifted property on the issue of alimony"). Both parties were nearing retirement, and neither was leaving the marriage with substantial assets or investment income.

On this array of facts, we conclude Robert has the more compelling argument for modifying the alimony award. Teresa's estimation of his earning capacity is not based on a realistic view of the record evidence. When we give proper weight to his age, his emerging health concerns, his lack of a college

degree, and the uncertainties that come with his relocation and the rebuilding of his consulting business,[10] we do not believe it would be equitable to require Robert to pay $2000 per month in alimony. We modify the decree to require an alimony payment of $1000 per month.

**Automatic Reduction at Retirement.** Teresa asks us to eliminate the automatic reduction in Robert's alimony obligation. She contends "future retirement will ordinarily raise too many speculative issues to be considered [in] the initial spousal support award," so the issue should be addressed in a later application to modify.

Robert contends his alimony obligation at retirement with social security benefits should be further reduced to $500 a month. He characterizes the $1000 amount as inequitable, reasoning because his estimated social security benefits are $2301,[11] he would be left with only $1301 after paying his alimony obligation, while Teresa would have $2250.50 ($1000 of alimony plus one half of Robert's social security benefits).

Contrary to Teresa's argument, we do not believe Robert's retirement raises too many speculative issues to be considered in the initial spousal support award in this case. *See Mauer*, 874 N.W.2d at 112 (concluding section 598.21A(1) required court to account for the retirement of both parties in setting spousal support). Although Robert testified he planned to work at least another

---

[10] We juxtapose these factors against Teresa's slightly younger age, her good health, her college degree, and her entrepreneurial endeavors during the marriage—all of which suggest she would require less support to be self-sustaining.
[11] Robert's social security statement estimates his monthly benefits based upon estimated taxable earnings per year after 2016 of $66,264.

ten years "to maximize [his] social security income," at that point, his income will be reduced significantly. We agree equity requires Robert's alimony obligation to be reduced to $500 per month when he obtains full retirement age and begins receiving social security benefits.

**Life Insurance Requirement.** Robert argues his obligation to provide a life insurance policy for Teresa's benefit should "either terminate in 2025 or be drastically reduced upon Robert reaching full retirement age." He reasons that his current policy will expire in 2025 and "any additional insurance through end-of-life would cost substantially more" than his current monthly rate of $114 a month. At trial, Robert estimated a new life insurance policy would cost him "at least a thousand dollars a month" due to his age and his recent medical diagnosis.

Teresa contends she "has demonstrated a need for the life insurance policy; Robert is several years older than her and she clearly needs and will rely upon the alimony that Robert is ordered to pay to support herself." She asserts Robert presented no evidence to show requiring him to maintain a life insurance policy would be "unduly burdensome."

The district court may require a spouse to maintain a life insurance policy for the former spouse's benefit to secure spousal support where the requesting spouse has a clear demonstrated need, such as a prior failure by the payor-spouse to fulfill his obligation or the inability of the beneficiary-spouse to support herself. *In re Marriage of Olson*, 705 N.W.2d 312, 317–18 (Iowa 2005); *see also In re Marriage of Lockard*, No. 15-0051, 2016 WL 146547, at *5 (Iowa Ct. App. Jan. 13, 2016) (affirming provision requiring life insurance policy to secure child

support and spousal support where beneficiary spouse had "limited employment experience, significant disability, and inability to support herself at a standard of living reasonably comparable to that enjoyed during the marriage"); *In re Marriage of Weber*, No. 98-1688, 2000 WL 278535, at *10 (Iowa Ct. App. Mar. 15, 2000) (modifying decree to remove life-insurance requirement when record contained "no evidence of insurability or costs, and no evidence of a significant reason for such a requirement").  But "such a requirement should be imposed only when the cost is known or can be reasonably estimated and the cost is neither unduly burdensome nor out of proportion to the benefits of providing such security."  *Weber*, 2000 WL 278535, at *10; *see also In re Marriage of Muow*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997) (noting amount of insurance policy "should be limited to the amount necessary to secure an obligation").

Teresa did not provide the court with a reasonable estimate of the cost to Robert for continuing his life insurance policy past 2025.  The only cost estimate came from Robert, who speculated that continuing his policy would be onerous, particularly considering his recent health issues.  We agree with Robert that his obligation to maintain a life insurance policy should terminate when his existing policy expires.  *See, e.g.*, *In re Marriage of Fitzgerald*, No. 14-1729, 2015 WL 3625040, at *4 (Iowa Ct. App. June 10, 2015) (declining to order life insurance requirement when spouse making request failed to provide "any information regarding the cost of any such life insurance policy" and was designated a partial beneficiary of preretirement and post-retirement Iowa Public Employees Retirement System death benefit); *In re Marriage of Wilson*, No. 14-0166, 2015 WL 1576411, at *3 (Iowa Ct. App. Apr. 8, 2015) (declining to award life insurance

requirement when spouse making request "did not reasonably estimate or ascertain the cost"). Accordingly, we modify the dissolution decree to provide for the termination of Robert's life insurance obligation in 2025.

## V. Trial Attorney Fees

The district court ordered Robert to pay $8637 of Teresa's trial attorney fees. The district court did not directly explain its rationale for arriving at that amount but did generally find Teresa should not have been required to rely upon her inherited monies to support herself throughout the proceedings and she "should be reimbursed an amount of money from Robert."

The district court has considerable discretion in awarding attorney fees in dissolution cases. *In re Marriage of Steele*, 502 N.W.2d 18, 22 (Iowa Ct. App. 1993). Generally, an award of attorney fees depends upon the financial situations of the parties and their relative ability to pay. *In re Marriage of Goodwin*, 606 N.W.2d 315, 324 (Iowa 2000). We will not disturb such an award absent an abuse of discretion. *See In re Marriage of Wessels*, 542 N.W.2d 486, 491 (Iowa 1995).

We find no abuse of discretion in the district court's attorney-fee award. Although Teresa had more liquid assets than Robert at the time of the trial, her available funds had steadily decreased. She was unemployed at the time of trial, and she has a lower earning capacity than Robert. Accordingly, we affirm the award.

## VI. Appellate Attorney Fees

Finally, Robert contends Teresa should pay his appellate attorney fees— $13,758—because she has "more liquid funds" than he does. Teresa argues

Robert should pay her appellate attorney fees because she "has been required to defend the district court's decision on appeal."

An award of appellate attorney fees rests within our discretion; it is not a matter of right. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). "[W]e consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013) (citation omitted). The relative merits of this appeal favored Robert, but neither party sits in a particularly flush financial position after the dissolution. Accordingly, we decline to order either party to pay the other's appellate attorney fees.

Costs are assessed equally between the parties.

**AFFIRMED AS MODIFIED.**