# IN THE COURT OF APPEALS OF IOWA

No. 18-0409
Filed March 6, 2019

IN RE THE MARRIAGE OF ROBERT ALLEN STERNER, JR.
AND MARY ANNE DUNHAM STERNER

Upon the Petition of
ROBERT ALLEN STERNER, JR.,
    Petitioner-Appellee,

And Concerning
MARY ANNE DUNHAM STERNER,
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Madison County, Richard B. Clogg, Judge.

The wife appeals the provisions of a dissolution decree involving spousal support, the division of farmland, the husband's inheritance, a personal-injury award, the filing of the parties' 2016 taxes, and possible bonuses and retirement contributions from the husband's employer that were to be received after dissolution took place. **AFFIRMED AS MODIFIED.**

Van T. Everett and Anjela A. Shutts of Whitfield & Eddy, PLC, Des Moines, for appellant.

Ted Engel of Engel & Maharry, Clive, and Jami J. Hagemeier of Williams & Hagemeier, PLC, Des Moines, for appellee.

Heard by Potterfield, P.J., and Tabor and Mullins, JJ.

**POTTERFIELD, Presiding Judge.**

Mary Sterner appeals from the decree dissolving her marriage to Robert Sterner Jr. Mary challenges a number of provisions in the decree, including those involving spousal support; the division of farmland; setting aside Robert's inheritance as non-marital; the determination Mary's personal injury awards were marital property; the filing of their 2016 taxes; and Robert's bonus and retirement contributions from 2017—the year of the dissolution. Additionally, she asks for an award of appellate attorney fees. Robert asks that we affirm the decree, deny Mary's request for appellate attorney fees, and award him fees instead.

**I. Background Facts and Proceedings.**

The parties were married in 1986. They had two children; both reached maturity before the time of the dissolution trial—in the summer of 2017.

At the time of trial, Mary was fifty-seven years old. She had worked outside of the home as a nurse at the beginning of the parties' marriage but had not done so since approximately 1990. Mary was injured in two car accidents: one in 2006 and one in 2010. She testified about a number of ongoing medical problems she suffered as a result.

Robert was fifty-nine years old at the time of trial and was employed as a national sales manager, which required him to travel approximately ten days a month. Robert earned a base salary of $150,000 annually and was eligible for monthly and annual bonuses—contingent on whether he met his sales goals. Robert testified that he did not anticipate earning an annual bonus for 2017.

At different times during the parties' marriage, they acquired several pieces of farmland, ultimately amassing approximately 640 contiguous acres. Mary's

parents and brother live nearby. Robert and Mary eventually built the marital home on one of the parcels. Robert testified the parties bought the land as part of a long-term investment strategy for their retirement. During their marriage, Robert and Mary rented out some of the tillable land, rented a building to a local company, and participated in the government's Conservation Reserve Program (CRP). Robert estimated the farm income from rentals and CRP payments to be $66,395 annually. Additionally, Mary ran a livestock operation. At the time of dissolution, the farm included cattle, miniature horses, poultry, water fowl, and goats. Mary testified, and Robert did not dispute, that all of the poultry and waterfowl, all but one goat, and about half of the miniature horses belonged to the parties' children. The district court did not consider the worth of these animals when dividing the marital estate. The parties also owned approximately 100 cattle. Both parties testified the farm did not earn enough to be self-sustaining.

Robert and Mary disagreed as to the value of the various parcels of land and how they should be divided. Each hired an expert to appraise the land, and both experts testified at trial. Mary expressed her desire to continue operating the farm. She proposed she be awarded more of the farmland—including specific parcels—in order to continue the farming operation or, alternatively, that she be allowed to take out a bank loan to purchase the rest of the land from Robert. Robert proposed dividing the land into two—each made up of four parcels. He testified he would be willing to take either of the two sections.

Robert asked the court to set aside the inheritance he received from his mother in 2014, and Mary asked the court to set aside the amounts she received for personal injury claims from both the 2006 and 2010 car accidents. Robert also

asked the court to order the parties to file their 2016 tax returns as married filing jointly; he testified he believed the parties would receive the largest refund if they filed that way. Mary asked the court to order the parties to file their returns separately and agreed that if they did so, Robert could keep any refund he received.

Additionally, Mary asked the court to award her traditional spousal support in the amount of $9000 monthly until she reached age sixty-five, then $5000 per month for two years, and then $3500 per month until she remarried or one of the parties' died.

In the dissolution decree,[1] the court set aside Robert's 2014 inheritance from his mother. The court determined all other property of the parties was marital and equally divided it between Robert and Mary. The court valued the parties' land at a total of $3,447,077 and accepted Robert's proposal for the land division. Based on the court's valuation of the various parcels, Robert received approximately $283,000 more in land value than Mary, but Mary received more than half of Robert's retirement accounts[2] and almost all of the funds in the parties' bank accounts.[3] Robert was ordered to pay Mary an additional $35,285 in an equalization payment, which was to be paid from one of Robert's retirement accounts. Each party was ultimately awarded approximately $2,175,850 in marital assets. Additionally, Robert was ordered to pay Mary traditional spousal support

---

[1] The court filed both a ruling and order correcting and amending the dissolution decree and an order nunc pro tunc after filing the decree. We refer to all of the rulings as the decree.
[2] Robert's various retirement accounts totaled $876,760.
[3] The parties had approximately $90,350 in their bank accounts.

in the amount of $3500 per month until she turns sixty-five, then $2500 per month for two years, and then $1500 until her remarriage or either party's death.

Mary appeals.

## II. Standard of Review.

Because an action for dissolution is an equitable proceeding, we review de novo. *In re Marriage of Thatcher*, 864 N.W.2d 533, 537 (Iowa 2015). While we examine the entire record and adjudicate the issues anew, we will only disturb the ruling of the district court if there has been a failure to do equity. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

## III. Discussion.

Mary challenges the economic provisions of the dissolution decree. She maintains the court was wrong to set aside Robert's inheritance as non-marital and argues the amounts she received from two personal injury suits should have been set aside. Additionally, she challenges the amount of spousal support she was awarded; argues the farmland should have been divided differently or she should have been allowed to purchase the rest of the farmland from Robert; asks us to adjust the court's order in regard to how the parties' 2016 taxes were to be filed; and maintains the court should have divided Robert's 2017 bonuses and retirement contribution.

### A. Inheritance.

We begin by considering whether the district court properly set aside the full amount Robert inherited from his mother two years before the dissolution action—approximately $134,000. *See In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (noting the court's first task in ensuring an equitable distribution "is to

determine the property subject to division"). Mary maintains it was inequitable to set the money aside, as it was commingled with marital funds and ultimately spent before the dissolution. Alternatively, she maintains the court should have set aside only the net amount of inheritance Robert received after paying taxes, penalties, and fees resulting from withdrawal of the funds from an IRA— approximately $94,000.

Pursuant to Iowa Code section 598.21(5) and (6) (2016), any property inherited by one party during the marriage is generally not subject to division unless refusal to divide the property will result inequity. When determining whether it would be unjust to exempt one spouse's inheritance from division, we consider the following:

> (1) contributions of the parties toward the property, its care, preservation or improvement[];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*McDermott*, 827 N.W.2d at 679 (alteration in original).

Mary ignores the five factors, arguing instead that the fact the inheritance funds were placed in a joint account before being applied to the mortgage for property owned by both parties is enough to defeat the protection afforded inheritance. We disagree.

First, placing inherited property into a joint account does not, in and of itself, destroy the separate character of the property. *In re Marriage of Liebich*, 547 N.W.2d 844, 850 (Iowa Ct. App. 1996). Second, the case law Mary relies upon is distinguishable from the facts presently before us.

In *In re Marriage of Meek-Dubcomb*, the district court refused to set aside the wife's inheritance when she had "freely and willingly spent all of the inheritance" and, at the time of trial, "none of the property presently owned by the parties could be traced to or characterized as proceeds of the funds inherited by" the wife. No. 10-0814, 2011 WL 768831, at *6 (Iowa Ct. App. Mar. 7, 2011). We agreed with the district court insofar as it would be inequitable to allow the wife to receive an offset for funds she spent which provided no economic benefit for the husband, as it would be allowing the wife to receive the benefit of the funds twice—once at the time she spent them and another time in the marital distribution. *Id.* Additionally, we agreed the wife should not receive an offset for the amount she claimed she used to pay bills because the "evidence does not clearly establish how these debts were generated or if [the wife] indeed paid them with her inherited funds." *Id.* We did, however, determine the wife should receive an offset for the value of the camper she purchased with inherited funds, as the expenditure could be directly traced to the wife's inheritance. *Id.* at *7.

In *In re Marriage of Fluent*, No. 16-1321, 2017 WL 2461601, at *3 (Iowa Ct. App. June 7, 2017), we found it inequitable to set aside the husband's inheritance as non-marital because he "voluntarily used his inheritance for the benefit of himself and his family," "there [was] no indication that any amount of that money remain[ed]," the wife did not uniquely benefit from the inheritance, and the money

was used "to maintain the parties' basic standard of living." Additionally, at trial, the husband had asked for the $74,000 "without providing any accounting for the[] expenditures or identifying any asset (beyond the marital home) into which the monies were allegedly spent." *Fluent*, 2017 WL 2461601, at *3 (footnote omitted). The marital home, into which the money purportedly went, netted only $22,000 in profit when sold. *Id.*

Finally, in *In re Marriage of Soloski*, No. 05-0310, 2006 WL 623583, at *5 (Iowa Ct. App. Mar. 15, 2006), we found it would be inequitable to set aside both a gift received by the husband and the wife's inheritance, as the husband received approximately $220,000 more than fifteen years before dissolution—money which had been commingled with marital money and used to the support the family—and the wife had inherited $7000 more than twenty years before dissolution.

Here, Robert inherited an IRA worth approximately $134,000 from his mother in 2014—about two years before filing for dissolution. It is undisputed that after paying the taxes, fees, and penalties associated with cashing out the inheritance from an IRA, Robert took the approximately $94,000 that remained and put the money toward the principal on a mortgage for some of the parties' farmland. According to Robert's testimony, the farmland was purchased by the parties' as an investment for their retirement, and at the time of dissolution, the land was still owned by the parties. While Robert voluntarily used the inherited funds to pay down a marital debt, the use of the inherited funds is traceable and the property was still in the possession of parties at the time of dissolution. Moreover, this is not a case where setting aside Robert's inheritance allows Robert to benefit from the funds twice nor where "the parties have enjoyed, over a length of time, a

substantial rise in their standard of living as the result of gifts or inheritance . . . " *In re Marriage of Goodwin*, 606 N.W.2d 315, 320 (Iowa 2000). We agree with the district court's decision to set aside Robert's inherited funds.

However, we do not disagree with Mary's contention that the more equitable amount to set aside as inheritance is that which Robert actually realized. *See, e.g.*, *In re Marriage of Peterson*, No. 01-0145, 2002 WL 180989, at *4 (Iowa Ct. App. Feb. 6, 2002) (considering whether to set aside the net inheritance—after the application of the Iowa inheritance tax). We do not believe Mary should share the responsibility for the funds Robert forfeited when he liquidated the IRA; neither Mary nor the marriage received any benefit from these lost funds.

Therefore, we adjust the offset for Robert's inheritance from $133,984 to $93,909, which changes the amount of the equalization payment owed to Mary by Robert from $35,285 to $55,323.

**B. Personal Injury Awards.**

Mary maintains the district court should have set aside as non-marital property the amounts she was awarded as a result of personal injuries she suffered in a 2006 and a 2010 car accident. Mary's argument is generally one of fairness—asserting that if Robert's inheritance is set aside as non-marital, the funds from her personal injury awards should be as well. But unlike personal injury awards, funds from inheritance are statutorily protected as the property of the person who received them. *See* Iowa Code § 598.21(5), (6). Settlement proceeds from a personal injury lawsuit do not automatically belong to either party and thus are subject to an equitable division at the time of the dissolution. *Schriner*, 695 N.W.2d at 497. Here, Mary's inability to testify credibly about how much she received,

when she received it, and how the money was spent during the intervening years undermined the court's ability to calculate any set-off.  Based on the record before us, we cannot say the district court acted inequitably.

### C. Division of Farmland.

Mary maintains the district court should have divided the parties' parcels of farmland pursuant to her proposed division rather than Robert's because she is the spouse who operated the farm, she expressed her desire to maintain the farming operation after the divorce, and her testimony explained why her proposed division was necessary for the farm to continue.  Alternatively, she maintains the court should have awarded her the entire 643 acres of farmland and ordered an appropriate equalization payment to Robert.

Mary argues the court failed to give the appropriate weight to Iowa's public policy in favor of protecting family farms.  She insists the court was required to do everything in its power to preserve the operation of the family farm, which she maintains is not possible with the current land division because she requires more pastureland, a fenced area, and the more reliable water well.

We acknowledge Iowa case law recognizes a public policy of preserving family farm operations.  *See, e.g.*, *McDermott*, 827 N.W.2d at 683.  Additionally, the supreme court has recognized the reasonableness of awarding the farm to the operating spouse "and in fixing the awards and schedule of payments to the other spouse without reaching *equality* so the farmer-spouse might retain ownership of the farm."  *Id.* (quoting *In re Marriage of Callenius*, 309 N.W.2d 510, 515 (Iowa 1981)).

But contrary to Mary's contention, the expressed goal of preserving family farms is not an absolute mandate. *See id.* ("[A] party's interest in preserving the farm should not work to the detriment of the other spouse in determining an *equitable* settlement."). Between Mary's proposal and Robert's proposal, Robert's is the more equitable. The division of land he proposed allowed each party to retain a dwelling, a working water well, and some income generating property.[4] Additionally, under Mary's proposal, Robert's parcels of land were several noncontiguous pieces, which would make travel between the different pieces difficult when using large equipment for farming operations. As the district court recognized, Robert's proposal "requires the least amount of fencing, surveying, and re-abstracting. Additionally, Robert's proposed division does not require easements for the entrance and exit to the divided property." Moreover, it is unclear if Mary's argument for certain parcels as necessary for the livestock operation still applies, as the district court ordered the parties to sell their cattle and split the proceeds—a provision Mary did not appeal.[5]

Mary argues in the alternative that she should have been allowed to purchase Robert's share of the farmland from him. At trial Mary testified she could take out a loan for up to $1.5 million in order to purchase the rest of the farmland. But Robert's share of the farmland was valued at $1,865,000.[6] And according to

---

[4] Robert proposed the land be divided into two separate groupings of four parcels, and he testified he was willing to take either grouping. The grouping Mary ultimately received allowed her to remain in the marital home and keep the land adjacent to land owned by her family.

[5] We do note the court also provided that either party was free to purchase any of the cattle they wished to keep at the time of the sale. We have no indication from the record whether Mary intended to do so.

[6] Neither Mary nor Robert challenges the district court's valuation of the land parcels. *See In re Marriage of Richards*, 439 N.W.2d 876 (Iowa Ct. App. 1989) ("The trier of fact is at

Mary's own admission, the farm has never made enough money to be self-sustaining.[7]  Mary does not otherwise work outside the home and has no other income.  She asks for a large amount of ongoing spousal support from Robert to continue to fund the farming operation.  *Cf. McDermott*, 827 N.W.2d at 683 (noting that though the award of the farm to one spouse and the resulting equalization payment to the other would require the farmer to take out a mortgage on the land, "the district court must have believed the property would generate sufficient cash flow to allow [the farmer] to make the necessary mortgage payments and to satisfy the equalization payment").  It is not equitable to award Mary the family farm and then require Robert to keep it afloat.  *Cf. Callenius*, 309 N.W.2d at 515 (declining to award the non-farmer spouse more land because "it would take away from [the farmer] an important source of income).

We affirm the district court's division of the parties' land.

**D. Spousal Support.**

Mary challenges the traditional spousal support awarded to her by the district court.  Mary asked the court to award her $9000 per month until she reaches the age sixty-five, then $5000 per month for two years until she reaches age sixty-seven, and then $3500 per month until either her remarriage or the death

---

liberty to accept o reject evidence as to the value of" property); *see also In re Marriage of Gensley*, 777 N.W.2d 705, 720 (Iowa Ct. App. 2009) (refusing to disturb the district court's assigned values when "[t]here is support for the district court's valuations and the values assigned to the property were within the permissible range of evidence").

[7] We acknowledge there is a difference between showing a loss for tax purposes and not being self-sustaining.  At trial, Mary testified:

> Well, we depended on Rob's bonus to pay for a lot of the farm things.  The farm has always had a loss on—had a loss, it's never made any money, so we use the farm money when and where we could.  And we—we'd have to depend on Rob's paycheck and bonuses to, you know, cover the rest of the expenses.

of either party. Instead, the court ordered Robert to pay Mary $3500 per month until she turns sixty-five, then $2500 per month for two years, and then $1500 until her remarriage or either party's death.

Mary argues the district court should have placed more weight on her need for support and on Robert's ability to pay.

The district court concluded, and Robert does not dispute, that an award of traditional spousal support is appropriate here. Robert and Mary had a long marriage—approximately thirty-one years. *See In re Marriage of Gust*, 858 N.W.2d 402, 410–11 (Iowa 2015) ("Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support"). Mary worked outside of the home as a nurse early in the parties' marriage, but confined her work to the family home and farm after 1990. *See id.* at 410 ("[P]articularly in a traditional marriage, when the parties agree a spouse should stay home to raise children, the economic consequences of absence from the workplace can be substantial."). Mary testified that her poor health and injuries limit her ability to return to the workforce. Like the district court, we have some doubts Mary is too injured to maintain regular work outside of the home but is able to operate the farm by herself. However, we agree with the district court's conclusion that "Mary cannot reasonably be expected to rejoin the work force." *See id.* (noting traditional alimony is often used in long-term marriages because "life patterns have been largely set").

"The imposition and length of an award of traditional alimony is primarily predicated on need and ability." *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998). "[T]he yardstick for determining need has been the ability of

a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during that marriage.'" *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 598.21A(1)(f)). Mary maintains that she has demonstrated a need of more than $14,000 per month to maintain the standard of living to which she is accustomed. But upon closer review, several expenses included in her financial affidavit are for parcels of property awarded to Robert, including electricity bills, household insurance, and real estate taxes. Additionally, some of the expenses she included are those of the parties' adult children. *See In re Marriage of Moore*, 702 N.W.2d 517, 518–19 (Iowa Ct. App. 2005) ("There is no obligation at common law to support an adult child who is not under a disability."). Other expenses, though not explicitly challenged by Robert at trial, are not plausible given the findings made by the district court. For example, the court found, "During the party's marriage they lived a frugal lifestyle. Other than [Robert's] contributions to his various retirement accounts, all of the party's disposable income was used to purchase additional land and to support their agricultural endeavors." But Mary claims her monthly expenditures include $750 on food for herself, $500 on vacations, $400 on gifts, and $100 per month on "office supplies."

Mary's financial affidavit does not provide an accurate basis for projecting her post-dissolution support needs. And even if it did, we would be forced to recognize that "[o]ften in marriage dissolutions incomes that were adequate to support married couples and their children are stretched precariously thin in order to cover the expenses of maintaining two separate households." *In re Marriage of Stenzel*, 908 N.W.2d 524, 534 (Iowa Ct. App. 2018) (citation omitted).

That being said, the district court did not state what income it used for Robert when determining the appropriate amount of spousal support. Robert testified that his base salary is $150,000 annually. He is eligible for both monthly and annual bonuses, and he received sizable bonuses three of the six years between 2012 and 2017. Robert earned $150,000 in 2013 and 2016 and testified he expected to earn a similar amount in 2017 because he was not on pace to earn an annual bonus.[8] But he earned $196,000 in 2012; $214,000 in 2014; and $225,000 in 2015. Additionally, Robert was awarded parcels of farmland that earned approximately $21,225 per year from rental income.[9] If we average Robert's salary from his employer over the six-year period for which we have information,[10] Robert earned approximately $180,000 annually from his employment. Adding the additional money he expects to receive from the farmland he was awarded, Robert has an annual income of $201,225.

In contrast, Mary's only income before spousal support is the approximately $45,000 from renting out farmland and a building on the property and CRP payments from the government. If we take the $3500 per month ($42,000

---

[8] Robert testified he anticipated being able to reach his sales goals again once the divorce process was finalized and he was able to concentrate on work more.

[9] Robert testified it was possible to earn more from the land—there was pastureland that could be rented if the parties no longer used it and, additionally, pastureland that could be turned into tillable farm land and CRP area. Robert estimated an additional $23,605 in farm income was possible, but it is not clear what steps would need to be taken or money spent for that to occur. We find this additional income too speculative at the time of trial to include it in Robert's annual income.

[10] While we are to determine the appropriate amount of spousal support based on the payor's earning capacity, *see Gust*, 858 N.W.2d at 411, we do not believe it is fair to assume Robert will earn the annual bonus every year. He only earned it half of the time over the period for which we have information, and the bonus relies on his sales—something not totally within his control. Therefore, we will not use his highest annual salary.

annually) in spousal support awarded by the district court from Robert and add it to Mary's income, Robert has a gross income of $159,225 while Mary's income is only $87,000 or $7250 monthly.[11] This is insufficient to allow Mary to live in the lifestyle to which she has become accustomed. Thus, we adjust the district court's award of traditional spousal support to award Mary $4000 per month in support until the age of sixty-five. We agree with the district court's award of $2500 when Mary turns sixty-five and the award thereafter of $1500 monthly after she turns sixty-seven, until Mary remarries or one of the parties dies. We decline to order Robert to maintain a life insurance policy to secure his spousal support payments, as Mary did not make such a request at trial and because there is no need for insurance to pay after Robert's death since his support obligation ceases at that time. *See, e.g.*, *In re Marriage of Lytle*, 475 N.W.2d 11, 11 (Iowa Ct. App. 1991).

### E. 2016 Taxes.

In its original decree, filed November 13, 2017, the district court found it was in Mary's and Robert's best interests to file their 2016 tax return as married filing jointly and ordered them to do so. Mary filed a motion to amend or enlarge the dissolution decree, claiming that the parties' final deadline to file their 2016 taxes had passed as of October 16, 2017, and that by the time the decree was entered, Mary had already filed her tax return as married filing separately. She asked the court to amend the decree to specify that the parties were to file as married filing

---

[11] The $42,000 in spousal support is nearly 27% of the difference between the two parties' incomes of $201,225 and $45,000. *See, e.g.*, *Gust*, 858 N.W.2d at 410 (citing with approval the court's prior affirmance of an award of spousal support that was 31% of the difference between the two parties' income in *In re Marriage of Michael*, 839 N.W.2d 630, 638 n.7 (Iowa 2013)).

separately and to allow Robert to claim all income and deductions from the family farm.

Robert resisted, arguing that if the parties filed their 2016 returns as married filing separately, he would incur a large tax obligation rather than receive a refund. Following an unreported hearing on this matter and others raised by both parties in post-dissolution filings, the district court did not amend the language of the decree as it relates to the parties' 2016 taxes.

We note that at trial, Robert actually estimated he would receive a refund whether they used the status married filing jointly or married filing separately as long as he was able to claim all farm income and expenses.[12]  He testified he anticipated approximately $14,000 in refund if they filed together and approximately $12,000 in refund if they filed separately and he was allowed to claim all of the farm deductions.

While the difference in refund amounts is not great, we see no reason why Robert should be punished for Mary's failure to file her 2016 tax returns in accordance with the decree.  Mary knew the status for filing the 2016 tax returns was an issue at the dissolution trial, yet she filed her return before the decree was issued.  We will not amend the decree to retroactively cure her action, especially where Mary offered no evidence to contradict Robert's claims about the benefit of filing as married filing jointly.

---

[12] We acknowledge Robert also testified that he may incur a tax liability of $14,000, but he testified to that amount under a scenario where he and Mary filed separately and each claimed half the farm income and expenses.

**F. 2017 Earnings and Retirement Contribution.**

Mary argues that because she was technically married to Robert until November 13 of 2017, she is entitled to the bonus, commissions, and retirement contributions from his employer that Robert earned for that year—even if Robert did not receive them until after the dissolution was final.

We acknowledge there was evidence that Robert typically received his annual bonuses in December of the year he earned them or in January of the next year. But there was no evidence at trial regarding how or when Robert's employer contributes to his retirement account. And Mary has provided no authority to support the division of any retirement contributions Robert received after their dissolution. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). Additionally, while the evidence established that Robert did not anticipate receiving a bonus for his 2017 sales performance, we find that any bonus he received after the date of the decree was not marital property. *See, e.g.*, *In re Marriage of Lalone*, 469 N.W.2d 695, 698 (Iowa 1991) (ruling that the bonus received by the husband one day before trial "is not marital property but is part of [the husband's] income which has already been taken into consideration setting the alimony" amount); *In re Marriage of O'Rourke*, 547 N.W.2d 864, 866 (Iowa Ct. App. 1996) (ruling that while the husband's bonus received after the dissolution was properly considered part of the husband's income for purposes of determining alimony and the equitable property division, the husband and wife were separated the whole time period the bonus was earned, there was no evidence the wife contributed anything to the acquisition of the bonus, and the bonus itself was not marital property to be divided).

We find no error in the district court's refusal to amend or enlarge the dissolution decree to award Mary any of Robert's possible 2017 bonus or tax contributions received after the dissolution was final.

**G. Appellate Attorney Fees.**

Both parties ask us to award them reasonable attorney fees. The award of appellate attorney fees rests within our discretion. *In re Marriage of Benson*, 545 N.W.2d 252, 258 (Iowa 1996). In making our decision, we consider the financial condition of the parties and the relative merits of the appeal. *See id.*

Here, neither party has been entirely successful. Additionally, while Robert has significantly more income than Mary, we believe our adjustment of the equalization payment and spousal support in favor of Mary equips her to pay her own appellate attorney fees. *See In re Marriage of Larson*, No. 14-1333, 2015 WL 5965116, at *10 (Iowa Ct. App. Oct. 14, 2015) (citing *In re Marriage of Hitchcock*, 309 N.W.2d 432, 438 (Iowa 1981)).

We decline to award either party appellate attorney fees.

**IV. Conclusion.**

Because we agree with Mary that Robert should not be allowed to offset the entire amount of his inheritance, we adjust the equalization payment Robert owes to Mary to $55,323. Additionally, we amend Robert's monthly spousal-support obligation to $4000 until Mary reaches the age of sixty-five—unless she remarries or dies before that time. We otherwise affirm the district court's dissolution decree. We decline to award either party appellate attorney fees.

**AFFIRMED AS MODIFIED.**