In re the MARRIAGE OF Marilyn
Sue GOODWIN and David
Duane Goodwin

Upon the Petition of Marilyn
Sue Goodwin, Appellant,

And concerning David Duane
Goodwin, Appellee.

No. 98–944.

Supreme Court of Iowa.

Feb. 16, 2000.

316

Maurine A. Braddock of Honohan, Epley, Braddock & Brenneman, Iowa City, for appellant.

Merry C. Ford and T.K. Ford of the Ford Law Offices, Burlington, for appellee.

Considered by LARSON, P.J., LAVORATO, SNELL, TERNUS, and CADY, JJ.

TERNUS, Justice.

This case arises from the dissolution of a long-term marriage between the appellant, Marilyn (Sue) Goodwin, and the appellee, David Goodwin. Sue appeals the trial court's property division, claiming (1) the court should have set aside to her life insurance proceeds she received prior to the parties' separation, (2) her property award was insufficient in light of the fact that the court did not award alimony, and (3) the court should have increased her property award in view of the domestic abuse she and the parties' children allegedly suffered at the hands of David. In response, David claims that there were additional assets that Sue dissipated prior to the dissolution that should be included in the property distribution. Finally, Sue asserts that the court abused its discretion in failing to require David to pay her trial attorney fees. Upon our de novo review, see *In re Marriage of Ask*, 551 N.W.2d 643, 645 (Iowa 1996), we modify the trial court's property division, and affirm as modified.

I. *Background Facts and Proceedings.*

Sue and David were married in 1967 when Sue was eighteen and David was twenty-four. Sue is a high school graduate, but David only completed the seventh grade. The couple had two children, Paul, born in 1968, and Jami, born in 1971. After the children were born, Sue stayed home to care for them.

In 1978, Sue returned to school and completed a one-year cosmetology program. She eventually opened her own shop in the family home. Over the years, her earnings from the shop averaged around $5,000 per year, with a high of $11,000–$12,000 and a low of $4,200. Sue also worked part-time at Pamida for $5.35 per hour. In 1996, the year Sue filed for dissolution, her gross earnings from both jobs was $7,108. In 1997, her gross income from her shop was $7,860.

Sue's employment provides her with no benefits. Therefore, in 1984, she began to contribute to an IRA at the rate of $2,000 per year to build a retirement fund. At the time of the dissolution, Sue's IRA had a value of $62,130.

Sue has suffered from depression for at least eight years. Her current medications cost in excess of $140 per month. In addition, she has carpel tunnel syndrome in her dominant hand, as well as neck and shoulder problems; both conditions require chiropractic care. Sue also anticipates significant dental work in the near future. She has relied in the past on David's health insurance coverage for these medical expenses.

David has worked throughout the marriage as a custodian in the Washington Community Schools. His salary has increased steadily from a starting figure of $4,000 per year to a salary of $22,000 at the time of the dissolution. His job also provides him with benefits in the form of medical insurance and IPERS, a retirement fund. The record shows that David has received some unreported income from the sale of scrap metal and other junk. His health is generally good.

In 1990, the couple's son, Paul, died in a motorcycle accident. He was single at the time of his death and was survived by an eighteen-month-old son. Paul had a life insurance policy in the amount of $43,000 payable to his mother, purportedly for her use and for the use of his son. Sue used the proceeds of the insurance policy in the following manner:

| | |
|---|---|
| Farm Bureau annuity | $10,100 |
| Home mortgage payoff | 7,200 |
| Washer and dryer | 1,000 |
| Rescue unit donation | 1,000 |
| Mutual fund | 20,800 |
| Paul's last expenses | 2,900 |
| **TOTAL** | **$43,000** |

Over the years, Sue made additional deposits to the mutual fund. She also transferred a total of $16,000 from the fund to her IRA. In 1994, Sue withdrew $6,000 from the mutual fund and gave it to Jami. Jami used these funds and $5,000 of her own savings to purchase a house on East

Third Street in Washington, Iowa. The balance of the $21,000 purchase price was supplied by a $10,000 loan that David and Sue secured from a friend, Hazel Corey. Jami was to make $250 monthly payments on the Corey loan. Jami did make some payments, but Sue also made payments in order to expedite payoff of the loan.

In September 1996, Jami decided to move to Colorado. David borrowed $30,000 from a local bank and paid Jami $29,000 for the East Third property. Jami was to use $15,000 to pay off the balance of a loan on a 1994 Blazer that was in Sue's name, and $2,000 to pay the remaining balance on the Corey loan. Jami made the payment on the Blazer loan, but did not pay off the Corey loan.

At about the same time, Sue canceled a life insurance policy on David's life. Although Sue was the owner and beneficiary of this policy, she acknowledged that the premiums had been paid in part from David's income. Sue received $22,000 from the insurance company. She used $2,000 to pay off the Corey loan, and gave the balance of the insurance funds to Jami in two $10,000 installments, one in November 1996, and the other in January 1997. David had no knowledge that the policy had been canceled.

In October 1996, Sue transferred title of the Blazer to Jami. When Jami moved to Colorado, however, she took a 1990 Buick Century, given to her by both of her parents in August 1996. The Blazer remained in Iowa at Hazel Corey's house where Sue had taken it.

Also in October 1996, Sue liquidated the mutual fund and received $29,000. This money was used over time for (1) attorney fees in the dissolution ($5,600), (2) car repairs ($500), (3) hail damage to the Blazer, (4) income taxes and penalties ($2,000), and (5) living expenses incurred by Sue after the parties' separation. At the time of the dissolution proceeding, Sue had $900 in her checking account. No other accounting was made of the proceeds of the mutual fund.

The parties separated in October 1996, and David moved from the marital home on North Fourth Avenue into Jami's former home. Sue filed a petition for dissolution of marriage in November. The action proceeded acrimoniously. Sue obtained a temporary injunction restraining David from entering their home, from placing harassing or threatening phone calls to her, and from canceling Sue's coverage under his health insurance policy. In addition, the parties frequently disagreed on the value and ownership of their property. Sue hired two appraisers and David hired one to appraise the couple's personal property.

In making the property award, the trial court noted that, while the gifts to Jami from Sue were unusual and had an effect on the marital assets, there was little to be done "but proceed to the point of what we now have as of the date of hearing." The court did, however, include the Blazer among the assets divided between the parties. The court also considered Sue's argument that she should be awarded property in lieu of alimony. In light of these factors, the court made the following property division:

| | Sue | David |
|---|---|---|
| North Fourth marital home | $ 74,000 | |
| Farm Bureau annuity | $ 15,371 | |
| Sue's IRA | $ 62,130 | |
| Checking account | $ 900 | |
| Blazer | $ 15,000 | |
| Chevy automobile | $ 1,000 | |
| East Third property | | $ 27,000 |
| IPERS | | $ 83,063 |
| David's IRA | | $ 11,518 |
| Dodge truck | | $ 5,000 |
| Personal property | $ 4,460 | $ 3,234 |
| **TOTAL** | **$172,861** | **$129,815** |

To make the distribution more equal, the court ordered Sue to pay the balance of the $30,000 bank loan, which was secured by the East Third property formerly owned by Jami and awarded to David. Subtracting the balance of this loan, $28,480, from the value of the property awarded to Sue, one sees that she netted approximately $14,000 more than did David from the trial court's property distribution.

The trial court made no award of alimony. Sue appealed, raising the issues listed earlier in our opinion.[1]

II. *Should the Life Insurance Proceeds From the Policy on Paul's Life be Set Aside to Sue?*

■ An equitable distribution of the parties' property must be made according to the criteria set forth in Iowa Code section 598.21(1) (1997). *See In re Marriage of Gonzalez,* 561 N.W.2d 94, 98 (Iowa App.1997). This statute excludes from the court's property division "inherited property or gifts received by one party." Iowa Code § 598.21(1). This exception is qualified later in the statute:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section *except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.*

*Id.* § 598.21(2) (emphasis added). For purposes of the present case, our analysis is twofold: (1) do the proceeds from Paul's life insurance policy qualify as inherited or gifted property; and (2) would it be inequitable to David to refuse to divide this property. (Although the latter issue would normally include an analysis of the inequities to the parties' children, such an inquiry is unnecessary here because Jami is an adult and is not dependent on her parents for her support.)

■ A. *Life insurance proceeds as inherited or gifted property.* David contends that the life insurance proceeds received by Sue upon the death of their son was not a gift to *her.* He argues that the funds were made payable to her simply because she had traditionally been the money manager for the family. We think this fact, if true, is more appropriately considered in

connection with the equities of excluding the property from division by the dissolution court. The evidence clearly establishes that Paul designated his mother as the only beneficiary of his life insurance policy. Therefore, we conclude that the proceeds constitute a gift to or inheritance by Sue. *See generally In re Marriage of Wertz,* 492 N.W.2d 711, 713 (Iowa 1992) (treating insurance proceeds received by one spouse as an inheritance). Accordingly, any remaining proceeds should be excluded from the property distribution unless it would be inequitable to do so.

■ B. *Equities of excluding the life insurance proceeds from the division of the parties' property.* In determining whether it would be inequitable to David to refuse to divide Paul's gift to his mother, we consider the following factors:

> "(1) contributions of the parties toward the property, its care, preservation or improvement[ ];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee."

*In re Marriage of Muelhaupt,* 439 N.W.2d 656, 659 (Iowa 1989) (quoting *In re Marriage of Thomas,* 319 N.W.2d 209, 211 (Iowa 1982)). We have also said that the length of the marriage may be an important factor in determining whether gifted property should be included in the court's property distribution. *See id.* As we not-

---

1. In addition to the listed issues, the parties also dispute the values placed on the marital assets by the trial court. Upon our review of the record, we are not inclined to disturb the district court's valuation of the parties' property.

ed in *Muelhaupt,* where the parties have enjoyed, over a lengthy period of time, a substantial rise in their standard of living as the result of gifts or inheritances, then any division of property should enable the parties to continue that lifestyle, even if that goal requires the division of gifted property. *Id.*

We have had several occasions to apply these rules, which provide guidance in the present case. In *Muelhaupt,* we concluded that it would be inequitable not to consider gifted shares of stock made to the husband representing a closely held family corporation. *Id.* at 660. The marriage lasted twenty years, during which time the parties shared a comfortable lifestyle in large part based on the husband's business income. *Id.* In contrast, the wife had never worked outside the home. *Id.* We held that the stock should be included in the court's division of assets, but that an equal distribution of the stock was not required. *Id.*

In the *Thomas* case, we applied the same factors to decide whether a farm, gifted to the husband, should be considered a marital asset subject to division in the dissolution action. 319 N.W.2d at 211–12. Certain factors supported such a division: (1) the wife had contributed toward improvement of the farm home; and (2) the wife had made extensive contributions to family income. *Id.* at 212. On the other hand, the wife was able to support and care for herself and had no special needs. *Id.* Under these circumstances, we concluded that, on balance, the farm should be set aside to the husband. *Id.*

More recently, in *In re Marriage of Geil,* 509 N.W.2d 738 (Iowa 1993), we held that farm property inherited by the wife and its related debt should be divided equally between the parties. 509 N.W.2d at 741. We noted that the farm had served as the family homestead and had provided the family's livelihood for many years. *Id.* In addition, the farm and its substantial debt were inextricably intertwined and it would be unfair to permit either party to leave the marriage without ongoing responsibility for this debt. *Id.* With respect to other inherited property, including jewelry, securities, and land in Texas, we observed that they had not provided a source of support during the marriage and, therefore, the husband could not complain if some portion of these assets were not awarded to him. *Id.*

■ Turning to the facts of the present case, we first address David's argument that Paul named his mother as beneficiary because she was the family's money manager. The record does support the conclusion that Sue was responsible for family finances. However, there is no other support for the conclusion that Paul's intent was that both parents share in the insurance proceeds other than David's assertion of that fact. Furthermore, the record does not reveal any reason that Paul could not have named his father as an additional beneficiary on the policy if he had wanted the policy benefits to be distributed to both of his parents. Finally, other than the fact that David was Paul's father, there is no evidence in the record of a close relationship between them.

Examining the *Muelhaupt* factors, we find nothing in the record to show that David contributed to the care, preservation, or improvement of the assets acquired with the insurance proceeds. We have already addressed the nature of the relationship between the donor, Paul, and David, and find nothing there to support a conclusion that it would be inequitable to give effect to Paul's express intent by allocating the insurance proceeds to Sue. Although both parties helped to preserve assets purchased with the policy benefits through their contributions to their joint economic welfare, David certainly contributed more funds to the maintenance of the parties by virtue of his higher income. On the other hand, as the trial court observed, Sue was a shrewd money manager and was able to maximize the parties' wealth through her efforts in supervising their finances. We also note that, with the ex-

ception of the purchase of a washer and dryer, Sue's inheritance was not used to raise the parties' standard of living. Finally, with respect to the special needs of the parties, Sue has emotional, physical, and dental problems; David is in good health. Considering all factors, we think that on balance there is no inequity in setting aside the identifiable assets purchased with the insurance proceeds to Sue.

C. *Assets to be set aside.* The insurance proceeds totaled $43,000. Some of these proceeds were spent on items other than the acquisition of assets: (1) the $1,000 contribution to the local rescue unit; and (2) $2,900 for Paul's funeral expenses. Sue used $1,000 of the insurance benefits to purchase a washer and dryer. The record does not establish whether the washer and dryer awarded to Sue in the court's property distribution is the one she purchased with her inheritance. In any event, the value of the washer and dryer listed in the parties' assets is only $200 to $250, a de minimis amount in the context of this issue. Therefore, we will not be concerned with these items.

The Farm Bureau annuity that was funded with a portion of the proceeds still exists and should be excluded from the property division. The mutual fund no longer exists, but the evidence shows that Sue gave Jami $6,000 from this account as a gift. Sue also testified that $16,000 from the mutual fund was transferred over time to Sue's IRA. She requests that this amount, plus an additional sum representing the growth of these monies, be set aside from her IRA. We set aside $14,800 from Sue's IRA, a figure that represents the balance of her original contribution to the mutual fund made from her inheritance ($20,800 less $6,000). We decline to set aside any additional amount attributable to earnings because the record does not provide a basis to calculate any such earnings. Finally, we deduct $7,200 from the value of the parties' marital home, which was awarded to Sue, representing her pay off of the mortgage with the funds she inherited. *See Wertz*, 492 N.W.2d at 714 (excluding from division of assets $22,000 mortgage payment made on marital home from wife's inheritance).

In summary, with respect to Sue's inheritance, we exclude from the property distribution the Farm Bureau annuity, $14,800 of Sue's IRA, and $7,200 of the value of the marital home. This action results in a total reduction of $37,371 in the property awarded to her. We now consider whether other disputed items should be included in the property distribution.

III. *Inclusion of Property that Sue Disposed of Prior to the Dissolution.*

■ The parties disagree with respect to whether other assets should be included as part of the property awarded to Sue: (1) the Blazer sold or given to Jami; (2) the cash value received by Sue when she canceled the policy on David's life; and (3) the funds from the liquidated mutual fund that were not attributable to Sue's inheritance. We begin our consideration of this issue with the observation that a spouse's disposal of assets that would otherwise be subject to division in the dissolution may properly be considered in making an equitable distribution of the parties' property. *See In re Marriage of Cerven*, 335 N.W.2d 143, 146 (Iowa 1983) (holding that property transferred by a spouse to avoid support obligation may be considered on the issue of property distribution as well as alimony).

■ A. *The Blazer.* The evidence shows that the Blazer was in Sue's name until one month before she filed the present action. At that time, she asserts, she sold the Blazer to Jami. Jami purchased the Blazer, according to Sue, by Jami's payment of the remaining balance on the car loan. David, on the other hand, contends that the vehicle was not sold to Jami and that Sue's transfer of the Blazer to Jami is a sham.

The record shows that Jami paid the $15,000 balance on the Blazer loan from the $29,000 she received from her father when her parents purchased her home. David testified that he did not intend that Jami have the Blazer in return for her payment of the car loan. He said that the purpose of obtaining such a large loan was so that the parties' car loan could be paid off. His testimony is credible for several reasons. First, Jami had not invested $29,000 in the East Third Street property. Second, the house did not have a value of $29,000. The purchase price of the house was only $21,000 two years earlier, and at the time of trial, two years later, the house was still valued at less than $29,000. These facts are consistent with David's testimony that not all of the $29,000 was intended as payment to Jami for the house, but rather that a portion was to benefit David and Sue. Therefore, we find that Jami did not purchase the Blazer.

We also find that the vehicle was not given to Jami. Jami has never taken the vehicle to Colorado where she lives, and she already has a car in Colorado, a Buick her parents gave her. These circumstances indicate that the transfer was in form only; title to the vehicle has changed, but possession, or the ability to possess, remains with Sue. Therefore, the trial court properly included the Blazer in its division of the parties' property.

B. *Cash value of life insurance on David.* As discussed earlier, Sue owned an insurance policy on David's life. The premiums were paid with joint earnings of the parties. Shortly before the filing of this action, Sue cashed in the policy and received approximately $22,000. Of this amount, $2,000 was used to pay off the Corey loan. Sue gave the balance of the insurance proceeds, $20,000, to Jami. David had no knowledge of, nor did he participate in, the decision to cancel the policy and give the bulk of the proceeds to Jami.

We first point out that the cash value of the life insurance policy on David was a marital asset. *See generally In re Marriage of Conley,* 284 N.W.2d 220, 222 (Iowa 1979) (including in the division of assets the value of spouses' life insurance policies). The fact that Sue owned the policy is not determinative. More relevant is the fact that the cash value accrued as a result of premium payments made from the parties' joint earnings. We conclude that Sue's unilateral disposal of this asset does not prevent its inclusion in the court's division of their property, with the exception of the $2,000 payment made on the parties' joint obligation to Hazel Corey.

C. *Balance of mutual fund account.* A month before she filed this dissolution action, Sue liquidated the balance of her mutual fund and received approximately $29,000. Although this account had originally been partially funded with $20,800 from Paul's death benefits, by the time the account was liquidated, those funds had been withdrawn. (Sue gave $6,000 to Jami, and used $14,800 to fund her IRA.) The remainder represented contributions Sue had made to the account during her marriage to David. The only source of these contributions was the parties' income. Accordingly, we consider the remaining monies in the mutual fund a marital asset.

As itemized in the statement of facts, Sue accounted for approximately $9,000 of expenditures made from the funds in this account, including dissolution attorney fees, car repairs, and income taxes. She also claims a portion of these funds were used for her living expenses during the parties' separation. Assuming her living expenses were consistent with the financial statement she filed in this action, there remains approximately $9,000 for which no accounting has been made. We think this amount should be included in the division of the parties' assets.

IV. *Should Sue be Awarded Additional Assets in Lieu of Alimony?*

Sue has always taken the position that she would prefer to be self-supporting,

that is, she would rather have additional assets in lieu of an alimony award. Given the acrimonious relationship between the parties, the trial court agreed. So do we. The question, then, is what amount of property would be an adequate substitute for David's alimony obligation.

■ Before we address this question, we consider David's argument that Sue is not entitled to alimony in any form. We reject this assertion based on our evaluation of the statutory factors relevant to this issue. *See generally* Iowa Code § 598.21(3) (listing factors to be considered by the court in making an award of alimony). The marriage was of long duration. During the child-rearing years, Sue remained at home and was the primary caretaker. Even though Sue returned to the workplace some twenty years ago, there remains a significant disparity in the earning capacities of the parties. Although neither party has a high income, David's salary and benefits are approximately two to four times Sue's combined self-employment and part-time employment income. In addition, Sue's physical and mental conditions generate added expenses and make it unlikely that she will ever enjoy a level of income commensurate to that of David. *See generally Wertz,* 492 N.W.2d at 714 (in determining the appropriateness of alimony, the court must balance the ability of the supporting spouse to pay against the relative needs of the supported spouse).

At this point it is helpful to review the property distribution, as our prior discussion has modified it:

|  | Sue | David |
|---|---|---|
| North Fourth marital home | $ 66,800 | |
| Sue's IRA | 47,330 | |
| Mutual fund | 9,000 | |
| Cash value of life insurance | 20,000 | |
| Checking account | 900 | |
| Blazer | 15,000 | |
| Chevy automobile | 1,000 | |
| East Third property | | $ 27,000 |
| IPERS | | 83,063 |
| David's IRA | | 11,518 |
| Dodge truck | | 5,000 |
| Personal property | 4,560 | 3,234 |
| **TOTAL** | **$164,490** | **$129,815** |

Under this division of the parties' property, Sue receives approximately $34,500 more than David.

There is, however, one additional complicating factor: the trial court ordered that Sue pay the mortgage on the home awarded to David. The balance on this loan at the time of trial was $28,480. If this part of the trial court's decree were allowed to stand, Sue would receive only $6,000 more in assets than David would receive. We think this figure is an inadequate substitute for an award of alimony. Therefore, we modify the court's judgment by deleting Sue's obligation to pay the mortgage on the East Third property. That mortgage shall be David's responsibility.

When this change is factored into the property distribution, the difference in the property awards made to Sue ($164,490) and David ($129,815–$28,480) is $63,165 in Sue's favor. Although we consider Sue's assets gained through her inheritance since they will provide a source of income and support for her in years to come, *see In re Marriage of Hardy,* 539 N.W.2d 729, 732 (Iowa App.1995), we are also mindful of Sue's greater medical expenses and lower earning capacity. On balance, we think that this division of the parties' assets is adequate to replace the alimony to which Sue would otherwise be entitled.

V. *Should Sue's Property Award be Increased to Compensate her for David's Alleged Domestic Abuse?*

The final issue with respect to the division of the parties' property is Sue's contention that she should be awarded an additional share of the parties' assets as compensation for domestic abuse she claims to have suffered. The record is extremely void of any evidence to support this accusation. Nevertheless, even if we assume the record would factually support such an award, there is no legal basis for it.

■ Domestic abuse is not included as a factor to be considered in the division of

property in a dissolution action. *See* Iowa Code § 598.21(1) (listing factors to be considered by the court in equitably dividing the property of the parties). Sue argues that domestic abuse should be considered under the catchall provision, allowing the court to consider "[o]ther factors the court may determine to be relevant in an individual case." *Id.* § 598.21(1)(m). We reject this argument because it would introduce the concept of fault into a dissolution-of-marriage action, a model rejected by our legislature in 1970. *See In re Marriage of Williams*, 199 N.W.2d 339, 341 (Iowa 1972) (pointing out that legislature eliminated fault as a standard for granting a dissolution). Therefore, we will not make an adjustment in the property award to compensate Sue for the domestic abuse she claims to have suffered.

VI. *Did the District Court Abuse its Discretion by Failing to Award Sue Attorney Fees?*

An allowance of attorney fees depends on the financial condition of the parties and their relative ability to pay. *See Locke v. Locke*, 263 N.W.2d 694, 696 (Iowa 1978). The trial court has considerable discretion in this matter. *See id.*

Here, the trial court ordered the parties to pay their own attorney fees. In view of the fact that Sue used monies from the mutual fund, a marital asset, to pay her attorney fees, we find no abuse of discretion in the court's decision. We also note that Sue's inheritance and the fact that she was awarded more of the parties' property than was David make her well equipped to pay her own attorney fees. For the same reasons, we reject her request for appellate attorney fees.

In view of David's assets and earnings, we also deny his request for attorney fees on appeal.

VII. *Summary.*

We affirm the trial court's judgment with the exception that Sue is not required to pay the mortgage on the home awarded to David. Sue is awarded no alimony. Both parties are to bear the expense of their own attorneys at trial and on appeal. Costs of appeal are taxed equally to the parties.

**AFFIRMED AS MODIFIED.**