# IN THE COURT OF APPEALS OF IOWA

———————————

No. 24-2072
Filed January 7, 2026

———————————

**In re the Marriage of Jennifer Angela Humphrey and
Marc Allen Humphrey**

Upon the Petition of
**Jennifer Angela Humphrey,**
Petitioner–Appellant,

And Concerning
**Marc Allen Humphrey,**
Respondent–Appellee.

———————————

Appeal from the Iowa District Court for Dallas County,
The Honorable Thomas P. Murphy, Judge.

———————————

**AFFIRMED**

———————————

Kimberley K. Baer (argued) of Baer Law Office, Des Moines,
attorney for appellant.

R.A. Bartolomei (argued) of Bartolomei & Lange, P.L.C., Des Moines,
attorney for appellee.

———————————

Heard at oral argument by Chicchelly, P.J., and Buller and Langholz, JJ.
Opinion by Langholz, J.

**LANGHOLZ, Judge.**

After two years of high-conflict litigation and an exceedingly contentious three-day trial, Jennifer Humphrey appeals the decree dissolving her nineteen-year marriage with Marc Humphrey. She challenges the district court's decision to place the parties' two minor children in Marc's physical care rather than in their joint physical care. She makes a host of challenges to the decree's financial provisions, arguing that (1) she should have received an extra $1.3 million as an equalization payment because of many errors in the identification and valuation of marital property; (2) the child- and spousal-support decisions were based on an incorrect determination of Marc's income; and (3) she should have been awarded some ongoing spousal support rather than a $170,000 equalization payment in lieu of spousal support. Finally, Jennifer challenges the district court's denial of her request for trial attorney fees and seeks an award of appellate attorney fees.

On our de novo review, we affirm. Giving appropriate deference to the district court's factual findings—especially considering the parties' high degree of conflict and difficulty in communicating and showing mutual respect—we agree that joint physical care is not in the best interests of the parties' children. Although some of Jennifer's challenges to the court's identification and valuation of the marital property have merit, even accounting for those adjustments, the district court's property division is equitable—indeed it substantially favors Jennifer. We agree with the court's determination of Marc's income. And given all the unique circumstances here—especially Marc's comparatively advanced age—we also agree that the award of an equalization payment in lieu of spousal support is appropriate. As for attorney fees, the district court did not abuse its discretion in denying Jennifer's request and we likewise decline to award appellate attorney fees.

## I.     Background Facts and Proceedings

Marc and Jennifer married in March 2005. Marc was then fifty-one and Jennifer was thirty. They have three biological children together. At the time of trial, their oldest daughter was eighteen—attending college out of state—their younger daughter was twelve, and their youngest son was ten. Jennifer also has another son from a previous relationship whom Marc adopted.[1] The son was three years old when the parties married, and by the time of trial, he was twenty-two and attending law school.

Marc is an attorney with a solo legal practice focusing mainly on representing personal-injury plaintiffs. Jennifer is currently a nurse. Her employment varied during their marriage. When they welcomed their first child in 2006, Jennifer was in nursing school and working as a certified nursing assistant. She took time off school and that job to care for their first-born and then obtained her nursing degree in 2008. Around 2010, she began working "on and off" as an unpaid legal assistant for Marc for a few years.

The family's income from Marc's legal practice—structured as an S corporation—varied wildly throughout their marriage. Most of Marc's cases were on a contingency-fee basis. And he financed his law firm's expenses on a line of credit. In 2012, after an unexpected loss in a case on which Marc had spent significant expenses, the family suffered a dramatic financial crisis. Their bank ended the line of credit, they lost their home and other commercial property, and the bank obtained two deficiency judgments—one against the law firm and Marc and a second against Marc and Jennifer. At the time of trial, the amount still owed on these judgments totaled more than $1 million.

---

[1] Marc also has three other adult children from a previous marriage.

During this time, Jennifer returned to work as nurse to help support the family. By 2015, the family's financial situation improved somewhat after Marc's lucrative resolution of another case. They bought a new home on nearly 13 acres and a 26-acre undeveloped tract of land that they rent out to a farmer who grows alfalfa. And Jennifer stopped working outside the home to help care for their children—then ages one, three, and ten.

The parties paint starkly different portraits of family life over the next seven years. Because of the narrow joint-physical-care question before us on appeal, and the district court's finding that neither party was entirely credible, we need not resolve most of those disputes. But the parties agree that even during this time that Jennifer was staying home, she was repeatedly absent from the home—at least once out of state—for days or weeks without telling her family members where she was.

Jennifer was also an avid—and apparently talented—gambler, frequenting the Prairie Meadows Casino. Over the course of the marriage she withdrew $80,000 from a joint account to finance her gambling activities. And she realized about $195,000 in gambling winnings—not including the $80,000 she spent. But she failed to pay taxes on those winnings, resulting in a $60,000 unpaid tax liability.

Tax debt haunts Marc as well. He failed to file taxes from 2019 through 2023, resulting in about $1.3 million in state and federal tax liabilities. Marc explained that during some of these years his law firm again suffered financial losses, and he chose to support his family rather than pay taxes. At the time of trial, Marc had set aside $875,000 from his law firm income in 2024 in an escrow account for the payment of some of the liability as he worked with a tax attorney to resolve the issues.

In May 2022, a heated argument led to Jennifer smashing their Mercedes with a baseball bat and puncturing its tires with a screwdriver. Jennifer has not lived in the family home since. The incident led to criminal charges—Jennifer eventually pleaded guilty to fourth-degree criminal mischief, resulting in a deferred judgment and a five-year no-contact order protecting Marc.[2]

Two weeks after that incident, Jennifer petitioned to dissolve the parties' marriage. The case quickly devolved. Jennifer submitted a fraudulent affidavit—purportedly from a third party supporting her request for temporary physical care—earning admonition and sanction from the court. Marc was similarly admonished for his "'scorched earth' approach in his battle with Jennifer," including involving the parties' children in the case. But ultimately, in its November 2022 temporary-matters order, the court placed the minor children in Marc's sole legal custody and ordered limited—and initially supervised—but gradually increasing parenting time for Jennifer. The court also ordered Marc to pay monthly spousal support of $2,500 while the dissolution proceeding continued.

After a three-day trial in September 2024, the district court dissolved the parties' marriage. Consistent with the agreement of the parties, the court ordered joint legal custody of their two minor children. But the court rejected Jennifer's request for joint physical care. The court reasoned:

> In this case, joint physical care will not work. While the parties live near each other, factors work against them. Marc spent more time parenting the children both before and after separation. Marc and Jennifer parent differently. He provides structure and helps the children set and achieve goals. Jennifer is more of a free spirit. Marc and Jennifer were very

---

[2] Marc also later obtained a protective order under chapter 236 based on a separate allegation of domestic abuse assault. But that order had expired by the time of trial.

bitter toward each other, and both engaged in less-than[-]desirable behavior.

> While they are communicating better, they do not communicate well enough for them to share equal time with the children during the school year. That is when children's normal and extracurricular activities interfere with co-parenting, even between parents who split parenting time and duties before separation and who communicate well. [Marc] and Jennifer's parenting and communication history demonstrate that it is not in the children's best interest to equally split their time between households during the school year. If the going gets tough, the court is concerned about each party's willingness to support each other's relationship with the children.

The court went on to conclude that in the absence of joint physical care, "on a day-to-day basis, during the school year, Marc can provide better care." It explained that while some evidence could suggest a concern that Marc would undermine Jennifer's relationship with the children, "in practice, Marc has been generous in sending the children for visits with Jennifer." And it reasoned that he "provided more care for the children before and after the parties' separation" and "ensures that the children have structure and stay on track with school and extra-curricular activities."

The court thus placed the children in Marc's physical care and set a schedule with nine days of parenting time for Marc and five days for Jennifer every two weeks during the school year and alternating weeks of parenting time for each in the summer.

Based on a finding that Marc's income is $150,000 and Jennifer's is $75,000, the court ordered Jennifer to pay child-support of $827.14 per month when there are two eligible children, reducing to $680.05 when there is one eligible child.

In dividing the marital property, the court awarded most of the assets—including the marital home, an adjacent tract of undeveloped land, and Marc's law firm—to Marc. It also awarded Marc nearly all the parties' "substantial debts," including the judgments and the unpaid tax liabilities except for Jennifer's $60,000 tax liability arising from her gambling winnings. In addition to the tax debt and any other debts in her name or undisclosed, the court awarded Jennifer the now-repaired Mercedes valued at $10,000, any "[f]urniture and jewelry in her possession," and "[a]ny other accounts in her name." The court acknowledged that the division left Marc with "the lion's share of the debt" and he "may struggle financially," but reasoned that it "is fair because Jennifer is starting over."

The court also awarded Jennifer a $170,000 equalization payment in lieu of spousal-support. The court explained that the payment "contemplates each party's earning capacity" and "will serve a purpose similar to alimony" by "allow[ing] Jennifer to approximate the lifestyle she enjoyed while married." And the court noted that while it might have otherwise awarded "$1,000 to $2,000 a month spousal support to Jennifer," a payment as part of the property division was more appropriate for many reasons. First, it reasoned that Marc "does not earn a considerable income every year, or every month," "has substantial debt to pay," and "may have a break in his practice" if he is "suspended for his failure to file tax returns."[3] It also reasoned that "Marc is about 70 years old" and "[t]he life expectancy tables suggest that he will not work forever." And the court factored in that "[t]here will be no taxes on a property settlement" and that "[t]he parties will not be in a perpetual state of financial anger if property, rather than alimony, is paid."

---

[3] The district court's prediction was prescient—in April 2025, the supreme court suspended Marc's law license for at least six months.

Finally, the court denied both parties' requests for attorney fees. The court found that both parties were correct in their accusation that the other was "dragging out litigation." The court elaborated:

> Jennifer's shenanigans involving the bogus affidavit and her failure to comply with discovery rules preclude an award of fees to her. Alone, Jennifer's conduct would warrant an award to Marc of some attorney's fees. But Marc will not receive them. Despite warnings from two judges, Marc's counsel behaved poorly. He berated Jennifer's counsel in countless emails. He badgered the court and counsel with motions that were blatant attempts to try the case and rehash addressed issues. His counsel assured the court that Marc received all correspondence in the case. Despite conceding joint custody and extended overnight visitation for Jennifer, he painted her as an unfit parent.

> Unfortunately, at times, Jennifer's counsel took the bait. She told the court that she was being bullied, and she was. But she sometimes responded unnecessarily.

Only Jennifer now appeals.[4]

---

[4] Marc initially cross-appealed but voluntarily dismissed his cross-appeal at the time he filed his amended brief. *See* Iowa R. App. P. 6.1201(2) (authorizing voluntary dismissal of cross-appeal "at any time before a decision is filed" by an appellate court).

In her reply brief, Jennifer repeatedly cites to Marc's original brief and argues that his amended brief—filed five days after his original brief and before she filed a reply—violated court rules and orders because it includes substantive revisions. Jennifer's argument is without merit. Our appellate rules do not prohibit substantive changes in an amended brief or require court permission under these circumstances. *See* Iowa R. App. P. 6.901(8) (authorizing amendment of an appellee's brief without seeking court approval "once within ten days after service, provided no brief has been served in reply to it").

## II.    Physical Care

Jennifer first argues that the district court should have placed the parties' two minor children in their joint physical care rather than in Marc's physical care with liberal visitation for her.

We review the district court's physical-care placement de novo. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). We give the court's factual findings "weight and defer especially where the credibility of witnesses is a factor." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). This is because "the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript." *Id*. And this advantage "greatly help[s]" the district court "in making a wise decision about the parties" and their children. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (cleaned up).

Our overriding consideration is the best interests of the *children*—not the "perceived fairness to the *spouses*." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The factors in Iowa Code section 598.41(3) (2022) and those identified by our supreme court in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) guide us in discerning the children's best interests. And our goal "is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

Joint physical care is neither presumptively favored nor strongly disfavored. *See id*. at 692, 700. Still, "in many contested cases, the best interests of the child[ren] will not be advanced by joint physical care." *Id*. at 700. And "courts must examine each case based on the unique facts and

9

circumstances presented." *Id.* While not the exclusive factors for deciding whether joint physical care is appropriate, it is often important to consider: (1) the "stability and continuity of caregiving," (2) "the ability of spouses to communicate and show mutual respect," (3) "the degree of conflict between parents," and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *Id.* at 696–99.

The district court found that all these factors weigh against joint physical care. And on our de novo review, we agree.

First, we cannot say that the parties have shared parenting responsibilities equally in the past. *See id.* at 697. True, as Jennifer highlights, she was a stay-at-home-mom for much of the children's childhood. And despite the children's temporary placement in Marc's physical care during this pending case, he has voluntarily let them spend much extra time with Jennifer. But even so, as the district court found, "Marc spent more time parenting the children both before and after separation" and "is more engaged with their day-to-day lives and emotional and educational progression." He has been the parent who takes them to school, extracurricular activities, and church. He has coached both in multiple sports. He was responsible for shopping for their clothing, school supplies, and groceries. And according to the children's elementary school principal, Marc was the more-involved parent—attending school conferences and other events and communicating about the children's education. We also do not ignore that even during the time Jennifer was not working outside the home, she was often absent for days or weeks without telling her family members where she was—leaving Marc as the primary parent.

The parties presented less evidence about their respective approaches to daily matters. *See id.* at 699. But from what was presented, we again agree

with the district court that they "parent differently," with unique views of discipline, structure, and their roles as parents. So we cannot say Marc and Jennifer are "operating from the same page on a wide variety of routine matters." *Id.* And this limited agreement "on child rearing issues" thus increases "the likelihood that ongoing bitterness will create a situation in which children are at risk of becoming pawns in continued post-dissolution marital strife" if placed in the parties' joint physical care. *Id.*

Perhaps most important of all, Marc and Jennifer's high degree of conflict and difficulty in communicating and showing mutual respect counsel strongly against joint physical care. "A lack of trust poses a significant impediment to effective co-parenting." *Id.* at 698. So too is "a stormy marriage and divorce . . . a significant risk factor" because "[t]he prospect for successful joint physical care is reduced when there is a bitter parental relationship and one party objects to the shared arrangement." *Id.*; *see also In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007). The parties conduct through two years of court proceedings and three days of trial showed a bitter relationship between Jennifer and Marc. We can see that much merely from the words on the page—the district court had the further benefit of sitting through the trial in person to judge whether there was any prospect that the two could set aside the animosity to successfully partner as required for joint physical care.

It would not serve the interests of the parties and their family to memorialize all the details of their conflicts here. But we highlight that at the time of trial, a five-year no-contact order in Jennifer's criminal case still prohibited Jennifer from contact with Marc until September 2027. And even the court-appointed child and family reporter recommended against joint physical care "so that Marc and Jennifer do not have to haggle about activities

and sharing," thus "minimizing the opportunities for conflict" and setting "this family up to succeed."[5] We thus have little difficulty agreeing with the court's assessment that these factors weigh against joint physical care too.

At bottom, joint physical care is not in the best interests of the parties' children. We emphasize—like the district court—that this decision is not based on a conclusion that Jennifer is an unfit parent. To the contrary, we see no reason to disagree with the district court's findings that "[t]he children are safe in both their parents' care" and that "both love their children." Indeed, Marc's agreement to an equal split of time during summers—and the many visits he voluntarily offered while this case was pending—shows that even he does not seriously dispute this point.

Once a court decides that joint physical care is not appropriate, it must then decide in which parent's care the children should be placed. *See Hansen*, 733 N.W.2d at 700. Jennifer makes no challenge to this second step of the district court's analysis selecting Marc or otherwise challenging the details of the parenting schedule set by the court. And so, we affirm the district court's placement of the children in Marc's physical care.

## III.    Property Division and Support

Jennifer next makes a host of challenges to the decree's financial provisions. First, she argues that an equitable property division should have resulted in her receiving a property-equalization payment of $1,465,944.50 rather than $170,000 because of many alleged errors in the identification and valuation of marital property. Second, she contends that Marc's annual

---

[5] The child and family reporter still recommended a nearly equal parenting-time schedule for Jennifer—alternating the parties' time weekly all year rather than just in the summer as the court ultimately ordered. But on appeal, Jennifer challenges only the court's denial of joint physical care—not her schedule of parenting time.

income for purposes of calculating child support and spousal support should be $607,591.80 rather than $150,000. And third, she argues that it was inequitable for the court to order a $170,000 property-equalization payment in lieu of some award of spousal support. We review these financial provisions de novo. *See Hansen*, 733 N.W.2d at 690.

*Property Division.* In a dissolution decree, "the court shall divide all property, except inherited property or gifts received or expected by one party, equitably between the parties." Iowa Code § 598.21(5). "The legislature's choice of the word 'all' creates an expansive marital pot." *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). This pot subject to division also includes the marital debts. *See In re Marriage of Sullins*, 715 N.W.2d 242, 251 (Iowa 2006). And so, the court must decide on an equitable division of the marital assets and debts "in light of the particular circumstances of the parties" and considering the factors in Iowa Code section 598.21(5). *Id.* at 247 (cleaned up). While equity "does not require an equal division," our supreme court has "repeatedly insisted upon the equal or nearly equal division" because "[e]quality is . . . often most equitable." *In re Marriage of McDermott*, 827 N.W.2d 671, 682 (Iowa 2013) (cleaned up).

"The district court's first task was to identify and value all the assets subject to division." *Id.* at 678. Jennifer starts her multi-pronged attack on the court's property division at this step. To begin, she argues that the court should not have included $1,329,746.95 in state and federal tax debts in the marital pot because she was unaware that Marc had failed to pay taxes and his delinquency in doing so caused increased penalties and interest. We disagree. The tax debt was incurred during the marriage because of Marc's law-firm income—the main source of income for the family—and his choice to pay family expenses rather than the taxes. While those circumstances may

13

factor into the equities of who should be assigned the debt, they do not give a basis to remove the debt from the marital pot entirely. *See Sullins*, 715 N.W.2d at 251.

Jennifer also contends that the court failed to include in the marital pot $875,000 that Marc put in an escrow account to pay part of the tax debt. We agree that the escrow account is a marital asset. But contrary to Jennifer's interpretation of the decree, we understand the district court to have included the account in the marital estate and then assigned it to Marc. While Jennifer's confusion is understandable—as the decree never states a grand total of the marital assets and debts and the account was not included in the court's summary of Marc's financial affidavit—the decree repeatedly references the escrow account and none of its reasoning conflicts with this interpretation. Regardless, we include the escrow account in the marital estate for purposes of our de novo review of the property division.

Next, Jennifer challenges the court's valuation of a 26-acre tract of undeveloped land at $249,840 rather than $1.56 million. "Ordinarily, a trial court's valuation" of marriage property "will not be disturbed when it is within the range of permissible evidence," especially "when valuations are accompanied by supporting credibility findings or corroborating evidence." *Hansen*, 733 N.W.2d at 703. Here, the court had a wide range of evidence on the value of this tract of land. The parties bought the land in 2014 for $335,050. In Marc's first financial affidavit in August 2022, he estimated its value at $1.56 million based on a potential sale for residential development at $60,000 per acre. At another spot in attachments to that same affidavit, he noted the value would be $650,000 at a price of $25,000 per acre. In 2023, the county assessor assessed the value of the 26.32 acres at $43,860. And in his last financial affidavit just before trial, Marc valued the tract at $249,840.

14

The court's finding that the undeveloped land was worth $249,840 is within the range of permissible evidence. So we do not disturb it.

Jennifer similarly challenges the court's valuation of the family home, arguing that it is worth $719,560 rather than $513,580. She points to the conflict between Marc's testimony that his $513,580 valuation "came from the Dallas County Assessor[']s . . . 2023 assessment" and an admitted exhibit showing the assessor's 2023 assessment. That exhibit shows an assessed value of $719,560 for the family home and the 12.64 acres of land on which it sits. The assessment also breaks down that value between the dwelling and the land, assessing the value of the dwelling alone at $513,580—the figure Marc testified to—and listed on his final financial affidavit—as the full value of their "homestead."

We agree with Jennifer that the district court's valuation of $513,580 falls outside the range of permissible evidence. Although a property owner could testify that his property is worth less than its assessed value, Marc did not do so. He testified that $513,580 *is* the assessed value of his homestead. But the evidence before the district court showed that amount is only the value of the physical structure of the dwelling. For the first time on appeal, Marc contends that the amount he separately listed on his affidavit for "other real estate" includes the land under the family home so no adjustment to the homestead's valuation is needed. But it makes little sense to value and award only a home's structure without the land on which it sits. And we see nothing in the record or the decree suggesting that the district court did so.[6] Neither

---

[6] Indeed, since Marc's first financial affidavit filed in August 2022, he has split up the marital real estate between what he has labeled their "Homestead" and "Other real estate." And in his most extensive explanation of each—attached as an addendum to that affidavit—he explained that "[t]he homestead is on approximately 14 acres" and that the

can we say that we would have affirmed the valuation of the other tract of land if it included not just the undeveloped 26 acres but also their home's 12.64 acres. We thus value the family home at $719,560.

As her last valuation challenge, Jennifer argues that the court should have valued Marc's law firm at $748,350 rather than zero. She contends that the expert's valuation of the firm only calculated the firm to have a negative value when factoring in the bank judgment against the firm and that the district court thus essentially double-counted those debts by separately valuing them in the division while also reducing the value of the firm. Although we are not convinced that the district court double-counted the debts—since the decree never states a full accounting of the marital assets and debts—we agree that they should not be double-counted in our review. And we find it cleanest to thus value the law firm without including the judgment. But that does not mean the law firm's value is $748,350 as Jennifer argues. In a supplemental report and again in his trial testimony, the expert adjusted that valuation downward by $457,155—based on the firm's updated bank balances.[7] And so, even excluding the judgment, the law firm is only valued at $291,195. We use this valuation for the law firm in our review of the property division.

Building on these challenges to the identification and valuation of marital property, Jennifer argues that an equitable property division requires an equal division here. So she seeks an equalization payment of $1,465,944.50 rather than the $170,000 ordered by the district court. She

other real estate is "26 acres which are planted in alfalfa" and "zoned agricultural" that "sits contiguous to the 14 acres which make up our homestead."

[7] Based on this adjustment and including the judgment, the expert agreed at trial that the law firm had a negative net value of "approximately $550,000."

does not challenge the assignment of any of the specific assets or debts between the parties except for a few stray assertions that Marc should be responsible for her tax debt. But Jennifer's argument falters—even with our agreement on some of her identification and valuation challenges—because her math does not work.

Totaling all the marital assets and debts, the marital pot subject to division has a *negative* value of $192,066.[8] So an equal division—as Jennifer seeks—would have awarded each spouse assets and debts with a net *negative* value of roughly $96,000. Yet here, the district court decided that such an equal division would be inequitable and instead favored Jennifer by awarding assets and debts with a net negative value of $142,066 to Marc, and a net negative value of only $50,000 to Jennifer—not including the $170,000 equalization payment to Jennifer since it was awarded in lieu of spousal support rather than as part of equalizing the property division.

We cannot say that this division of the marital assets and debts is inequitable to Jennifer. Nor has she shown that equity demands that Marc take on the extra $60,000 tax debt that the court assigned to her or that he make an "equalization" payment of nearly $1.5 million—both of which would make the division even less equal. Thus, we do not disturb the district court's property division.

*Determination of Marc's Income.* Before turning to Jennifer's challenge to the district court's decision to order Marc to pay a $170,000 equalization payment in lieu of spousal support, we must consider her challenge to the

---

[8] We reach this calculation using the property and debts highlighted by Jennifer in her proposed calculation on page 48 of her opening brief, adjusting the valuations for the undeveloped land and the law firm where we have rejected Jennifer's proposed valuations, and including the $60,000 tax debt from her gambling winning in the marital pot.

court's finding that Marc's annual income—for both spousal- and child-support purposes—is $150,000. She argues the court should have found his income to instead be $607,591.80 based on her calculation of his law firm's average operating income over the last five years—excluding 2020 as the firm had an exceptionally high loss that year due to the pandemic.[9]

On our de novo review, giving due deference to the district court's preferred fact-finding position, we agree with the court that Marc's income for consideration of child and spousal support is $150,000. True, where a party's income fluctuates widely, averaging the income over a reasonable period will generally be the most accurate way to determine the party's income for child or spousal support. *See In re Marriage of Robbins*, 510 N.W.2d 844, 846 (Iowa 1994); *In re Marriage of Godbolt*, No. 22-1550, 2023 WL 4759454, at *4 (Iowa Ct. App. July 26, 2023). And completed tax returns are typically the best evidence of income. *See In re Marriage of Will*, 602 N.W.2d 202, 204 (Iowa Ct. App. 1999).

But the trouble is that the income evidence on which Jennifer seeks to rely is for the law firm—not for Marc personally. And as Marc's tax expert testified, because the law firm is an S corporation—with its income reported as a pass-thru on Marc's personal tax returns—even the information about Marc's total tax liability introduced into evidence does not show us how much income Marc actually received and had available for family expenses in any given year. *See In re Marriage of Rohde*, No. 03-1798, 2005 WL 291532, at *2 (Iowa Ct. App. Feb. 9, 2005) ("The income of a person employed by a

---

[9] Jennifer relies on the expert witness's report that the law firm had operating income of $1,128,092 in 2019 and $1,126,801 in 2021 and losses of $170,376 in 2020, $96,427 in 2022, and $31,885 in 2023. She also calculates her own estimate that the firm's 2024 income was $911,378 based on Marc's trial testimony about revenue received and the firms average annual expenses in past years.

family corporation, especially a Subchapter S corporation, may be difficult to ascertain."); *In re Marriage of Frett*, No. 03-1305, 2004 WL 1073989, at *2 (Iowa Ct. App. May 14, 2004) (explaining that while all of an S corporation's "profits are reflected in the parties' tax returns," that "does not mean . . . that all of the company's profits were available for the parties to spend on personal expenses").

Marc testified and submitted a financial affidavit stating that his income was $12,000 per month—or $144,000 per year. According to him, that was the amount he could take as a draw from the firm and use for essential family expenses. He explained that he has needed to leave as much money as possible in the law firm "to run a medical negligence practice"—especially after he no longer had a line of credit. Beyond the law firm, the evidence also showed that Marc receives rental income of about $3,800 annually from an alfalfa field on the undeveloped land next to his home.

Based on all this, the district court found that an income of $150,000 was a "fair" number—while also explaining that both "parties' credibility is a factor" and "[i]t is impossible to tell what either party could earn." What's more, the lack of better evidence supporting Jennifer's theory of a higher income is in large part due to her own actions in failing to develop the record and repeatedly violating her discovery obligations. Given the limited evidence before the district court, we agree with the court's reliance on Marc's estimates of his actual income drawn from the law firm and reject Jennifer's argument that all the law firm's operating income had to also be included even if retained by the firm. *See Rohde*, 2005 WL 291532, at *2 (affirming income determination for child support based on salary and bonuses from an S corporation but excluding retained corporate earnings that were reported as taxable income); *Frett*, 2004 WL 1073989, at *1–2 (reversing

income determination based on all S corporation profits because the party's "actual salary better represents his income for child support purposes").

We thus affirm the district court's determination of Marc's income. Because this factual challenge is Jennifer's only attack on the court's child-support award, we do not disturb that award. And we proceed to consider Jennifer's challenge to the $170,000 property equalization payment in lieu of spousal support using the court's finding that Marc's income is $150,000.

*Property Equalization Payment in Lieu of Spousal Support.* As with the other financial provisions, our review of the district court's spousal-support decision is de novo. *In re Marriage of Sokol*, 985 N.W.2d 177, 182 (Iowa 2023). We must not engage in "undue tinkering" and will "disturb the district court's determination of spousal-support only when there has been a failure to do equity." *Id.* at 182 (cleaned up).

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case." *In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022). A court must consider many factors when assessing a request for spousal support, including the marriage's length, the health and age of the parties, and their respective earning capacities. *See* Iowa Code § 598.21A(1)(a)–(j). While the division of property and an award of spousal support often serve different purposes, it is well-recognized that they must be considered together to determine an equitable result. *See In re Marriage of Owen*, No. 24-0830, ___ N.W.3d ___, ___, 2025 WL 3558456, at *5 (Iowa 2025); *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). Indeed, the governing statutes mandate that interrelated consideration. *See* Iowa Code §§ 598.21(5)(h), 598.21A(1)(c). Less commonly discussed, the statute also requires consideration, when dividing property, not just of "[t]he amount and duration" of spousal-

support payments but also "whether the property division should be in lieu of such payments." *Id.* § 598.21(5)(h); *see also In re Marriage of Goodwin*, 606 N.W.2d 315, 323 (Iowa 2000) (modifying property division to provide additional assets in lieu of spousal-support award); *In re Marriage of Ambrosy*, No. 12-0492, 2012 WL 5356102, at *4–5 (Iowa Ct. App. Oct. 31, 2012) (affirming disparate property division in lieu of spousal support); *In re Marriage of Hoker*, No. 11-1295, 2012 WL 1246731, at *3 (Iowa Ct. App. Apr. 11, 2012) (affirming payment as part of property division in lieu of spousal support).

Relying on this statutory authority, the district court decided that Jennifer was entitled to a $170,000 equalization payment as part of the property division in lieu of spousal support. Jennifer argues that the court should have instead ordered some ongoing monthly spousal support payments. But most of her argument is misplaced, focusing on how she meets the general criteria for some spousal support award. Of course, she does. And as with any property-division-in-lieu-of-spousal-support awards, the district court agreed that she does—such an award is only *in lieu of spousal support* if it takes the place of a spousal support award for someone who would otherwise be entitled to it. *See Goodwin*, 606 N.W.2d at 323 (before deciding the amount of an increased property award, confirming that the spouse would be entitled to spousal support); *Ambrosy*, 2012 WL 5356102, at *3–4 (same).

She offers little argument about why the $170,000 payment is insufficient to meet her needs for support or is otherwise inequitable—aside from highlighting her preference for spousal support rather than a property award unlike the spouse receiving the award in *Goodwin*, who wanted it. *See Goodwin*, 606 N.W.2d at 323. But while a party's preference between a

21

spousal-support or property award may well be an appropriate consideration in weighing the equities, we are aware of no authority that it is dispositive.

And we agree with the district court that the payment in lieu of spousal support is equitable under the unique facts here. At the time of trial, Marc was about to turn seventy-one and, as the district court observed, not likely to work forever. Jennifer is nineteen years younger. Plus Marc's income was unpredictable. And given the hostile relationship and contentious litigation, the prospect of future fights over modification of any spousal-support award would loom large. All this counsels toward providing for Jennifer's financial needs more definitively with a property award. *See id.* (agreeing that a property award in lieu of spousal support was appropriate "[g]iven the acrimonious relationship between the parties"); *Ambrosy*, 2012 WL 5356102, at *4 (agreeing with district court's reasoning that factored in possible conflict in ongoing spousal-support payments, explaining "Better to bite the bullet or, to mix figures of speech, take one's medicine all at once").

As already discussed, the property division favors Jennifer substantially even without adding in the $170,000 payment ordered in lieu of spousal support. So providing her an additional $170,000 as a part of the property division amounts to roughly the same support—not accounting for the time value of money—as receiving $2,000 monthly for seven years, when Marc would be turning seventy-eight. We see no reason to tinker with this with this payment in lieu of spousal support.

## IV.  Attorney Fees

Finally, Jennifer argues the district should have awarded her trial attorney fees and asks us to award appellate attorney fees.

We review the district court's award of attorney fees in a dissolution proceeding for abuse of discretion. *See In re Marriage of Witten*, 672 N.W.2d 768, 773 (Iowa 2003). Neither party has a right to attorney fees. *See id.* at 784. In exercising its "considerable discretion" over whether to award fees, the district court may consider "the respective abilities of the parties to pay" and whether the requested fees are "fair and reasonable." *Id.* (cleaned up).

The district court denied both parties' requests for attorney fees based mainly on their conduct unreasonably "dragging out litigation." The court highlighted Jennifer's submission of a fraudulent affidavit and failures to comply with discovery rules and much poor behavior by Marc's attorney that needlessly prolonged the case. While Jennifer is correct that Marc has a greater income, we cannot say that the district court abused its discretion in declining to award attorney fees under these circumstances.

Appellate attorney fees in a dissolution appeal are also discretionary. *See McDermott*, 827 N.W.2d at 687. In exercising our discretion, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up). Considering these factors—especially the relative merits of this appeal—we decline to award Jennifer appellate attorney fees.

**AFFIRMED.**